Filed 12/3/14 Opinion on remand from Supreme Court

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>MARK BUZA,<br><br>     Defendant and Appellant. | A125542<br><br>(San Francisco County<br>Super. Ct. No. SCN 207818) |

The sole issue in this case is the constitutionality of a provision of the DNA and Forensic Identification Data Base and Data Bank Act of 1998, as amended (Pen. Code, § 295 et seq.) (the DNA Act),[1] which requires that a DNA sample be taken from all adults arrested for or charged with any felony offense "immediately following arrest, or during the booking . . . process or as soon as administratively practicable after arrest . . . ."  (§§ 296.1, subd. (a)(1)(A); 296, subd. (a)(2)(C).)  In a prior opinion, we held that the seizure of appellant's DNA shortly after his arrest, at a time when he was entitled to the presumption of innocence and there had been no judicial determination of probable cause to believe he committed the offense for which he was arrested, violated his right under the Fourth Amendment to the United States Constitution to be free from unreasonable searches and seizures.  (*People v. Buza,* A125542, Aug. 4, 2011.)  The case now returns to us with directions from the California Supreme Court to vacate our prior decision and reconsider the matter in light of *Maryland v. King* (2013) ___ U.S. ___ [133 S.Ct. 1958] (*King*).

---

[1]  All statutory references are to the Penal Code unless otherwise indicated.

We have done so, and again reverse the judgment of conviction under the DNA Act. As we will explain, because of significant differences between the California DNA Act and the Maryland law considered in *King*, we question whether *King* establishes the validity of the California Act's application to arrestees under the Fourth Amendment. We base our decision, however, solely upon article I, section 13, of the California Constitution, which in our view undoubtedly prohibits the search and seizure at issue.

## FACTS AND PROCEEDINGS BELOW

Shortly after 3 o'clock on the morning of January 21, 2009, San Francisco Police Sergeant Jody Kato saw an orange glow emanating from a parked police car. When he realized the vehicle was on fire he saw a man, later identified as appellant, pop up from behind the vehicle and run into a nearby wooded area holding something in his hand. When another officer called out for him to surrender, appellant stepped out of the woods with his hands up. A search of the wooded area produced a road flare and a bottle containing a mixture of oil and gasoline. Matches were found in appellant's pocket and a container of oil was found in his backpack. A fire department investigator concluded that all four tires of the patrol car had been damaged by fire, and traces of polystyrene, gasoline residue and/or medium weight oil were found on two of the tires.

Several hours after his arrest, while he was confined in county jail and prior to any appearance before a magistrate or judge, appellant was asked to provide a DNA sample, as required by section 296, and refused, even after being informed that refusal to provide a sample would constitute a misdemeanor with which he would be charged.

On February 17, 2009, appellant was charged by information with arson (§ 451, subd. (d)–count 1); possession of combustible material or incendiary device (§ 453, subd. (a)–count 2); vandalism (§ 594–count 3); and refusal or failure to provide a DNA specimen (§ 298.1, subd. (a)–count 4). Appellant pleaded not guilty to all four counts.

With respect to the first three counts, appellant admitted at trial that he set fire to the patrol car's tires using a mixture of oil, gasoline, and styrofoam as an accelerant. He did not commit his acts maliciously, he testified, but to protest what he considered a

2

corrupt government and system and to call attention to a political group he had formed, whose web sites had been "deleted from the Internet."

As to the fourth count, shortly after appellant's arrest and while he was in county jail, San Francisco Sheriff's Deputy Kenneth Washington advised appellant that state law required him to provide a DNA sample, which would be obtained by swabbing the inside of his cheek with a cotton-tipped swab. When appellant stated he did not wish to provide a sample, Deputy Washington showed appellant a Penal Code section 296 collection form which stated "the law about 296 PC requirements." After appellant read the form, Deputy Washington again asked him to provide a sample, and appellant again refused. Appellant continued to refuse after being advised that his refusal was a misdemeanor offense with which he would be charged under section 298.1. Deputy Washington stated that provision of a DNA sample was required of all persons arrested for a felony offense, appellant had not been singled out, his DNA was not sought to connect him to evidence found at the scene, and it was not used for that purpose. Washington testified that at the time San Francisco deputy sheriffs seek a DNA sample from arrestees they also obtain two thumbprints and a signature, and he apparently had no difficulty obtaining these items from appellant.

On April 22, 2009, appellant unsuccessfully moved for judgment of acquittal on count 4, contending that his arrest for a felony offense does not create a constitutionally adequate basis for requiring him to provide a biological sample.

On April 30, 2009, the jury returned a verdict finding appellant guilty of all counts. That same day, the court ordered appellant to provide a DNA sample prior to sentencing. On May 28, 2009, after learning of appellant's refusal to comply with this order, the court issued an order permitting the San Francisco Sheriff's Department or the Department of Corrections to use "reasonable force, as outlined in P.C. 298.1, and in conjunction with guidelines of the Department of Corrections," to "bring defendant Buza into compliance" with section 296. Prior to the July 6, 2009 sentencing hearing, appellant provided a DNA sample.

3

Appellant was sentenced to the low term of 16 months in state prison on count 1, with an additional concurrent 16-month sentence on count 2, and a concurrent six-month county jail term on count 4, refusal to provide a DNA sample. A 16-month sentence on count 3 was stayed pursuant to section 654. The court granted appellant appropriate custody and conduct credits, imposed appropriate restitution fines, and ordered him to register as an arson offender under section 457.1. The court also informed appellant that he would be included in the State's DNA and forensic identification database and data bank program.

After this court reversed the conviction on count 4, the California Supreme Court granted respondent's petition for review (*People v. Buza,* S196200, Oct. 19, 2011), held the case pending the United States Supreme Court's decision in *King, supra,* 133 S.Ct. 1958, then returned it to us for reconsideration. (*People v. Buza,* S196200, January 16, 2013.)

## DISCUSSION

## I.

### *The Statutory Scheme*

California law enforcement officials have been authorized to collect forensic identification blood, saliva or buccal (cheek) swab samples from persons convicted of certain serious crimes since 1984. (See former § 290.2, added by Stats. 1983, ch. 700, § 1.) In 1998, the Legislature enacted the DNA Act (§§ 295-300.3; Stats. 1998, ch. 696, § 2), which required "DNA and forensic identification data bank samples" from all persons convicted of specified offenses. (§ 295, subd. (b)(2).)[2] The purpose of the DNA Act "is to assist federal, state, and local criminal justice and law enforcement agencies within and outside California in the expeditious and accurate detection and prosecution of individuals responsible for sex offenses and other crimes, the exclusion of suspects who

---

[2] "DNA database and data bank acts have been enacted in all 50 states as well as by the federal government. (See 42 U.S.C. §§ 14131-14134; and see Annot., Validity, Construction, and Operation of State DNA Database Statutes (2000) 76 A.L.R.5th 239, 252.)" (*Alfaro v. Terhune* (2002) 98 Cal.App.4th 492, 505.)

4

are being investigated for these crimes, and the identification of missing and unidentified persons, particularly abducted children." (§ 295, subd. (c).)

At the November 2004 General Election, California voters amended the DNA Act by enacting Proposition 69, the DNA Fingerprint, Unsolved Crime and Innocence Protection Act. That measure significantly enlarged the scope of persons subject to warrantless DNA searches by, among other things, providing that, beginning on January 1, 2009, warrantless seizure of DNA would be required of any adult arrested for or charged with any felony. (§ 296, subd. (a)(2)(C).)

Pursuant to the DNA Act, collection of DNA must take place "immediately following arrest, or during the booking . . . process or as soon as administratively practicable after arrest, but, in any case, prior to release on bail or pending trial or any physical release from confinement or custody." (§ 296.1, subd. (a)(1)(A).) DNA samples are ordinarily limited to collection of inner cheek cells of the mouth (buccal swab samples) with a small stick. (§ 295, subd. (e).) The taking of a DNA sample is mandatory; law enforcement officials lack discretion to suspend the requirement. (§ 296, subd. (d); *People v. King* (2000) 82 Cal.App.4th 1363, 1373.)

After the sample is taken, it is sent to the DNA Laboratory of the California Department of Justice (DOJ), which is responsible for the management and administration of the state's DNA and Forensic Identification Database and Data Bank Program and which stores, correlates and compares forensic identification samples for use in criminal investigations. (§§ 295, subds. (f), (g), (i)(1)(C); 295.1, subd. (c); *People v. King, supra,* 82 Cal.App.4th at p. 1370.) The Act directs the DOJ to analyze the DNA "only for identification purposes." (§ 295.1, subd. (a).) A genetic profile is created from the sample based on 13 genetic loci known as "noncoding" or "junk" DNA, because they are not known to be associated with any particular genetic trait, disease or predisposition. (*King, supra,* 133 S.Ct. at pp. 1966-1967, 1968; Cal. Bureau of Forensic Services DNA FAQ (FAQ), Searching the CAL-DNA Data Bank and CODIS, Ques. 3 <http://oag.ca.gov/bfs/prop69/faqs> [as of Dec. 1, 2014].) "[F]orensic analysis focuses on 'repeated DNA sequences scattered throughout the human genome,' known as 'short

tandem repeats' (STRs). [(J. Butler, Fundamentals of Forensic DNA Typing 5 (2009) (hereinafter Butler) at 147-148.)] The alternative possibilities for the size and frequency of these STRs at any given point along a strand of DNA are known as 'alleles,' [(*id.*, at 25)]; and multiple alleles are analyzed in order to ensure that a DNA profile matches only one individual. Future refinements may improve present technology, but even now STR analysis makes it 'possible to determine whether a biological tissue matches a suspect with near certainty.' " (*King,* at p. 1967, quoting *DA's Office v. Osborne* (2009) 557 U.S. 52, 62.)

The profile derived from the DNA sample is uploaded into the state's DNA data bank, which is part of the national Combined DNA Index System (CODIS),[3] and can be

---

[3] CODIS is a massive computer system which connects federal, state, and local DNA databanks. (CODIS Program and the National DNA Index System (Fact Sheet) <http://www.fbi.gov/about-us/lab/biometric-analysis/codis/codis-and-ndis-fact-sheet> [as of Dec. 1, 2014].) CODIS is also the name of the related computer software program. (*Ibid.*) CODIS's national component is the National DNA Index System (NDIS), the receptacle for all DNA profiles submitted by federal, state, and local forensic laboratories. (*Ibid.*) DNA profiles typically originate at the Local DNA Index System (LDIS), then migrate to the State DNA Index System (SDIS), containing forensic profiles analyzed by local and state laboratories, and then to NDIS. (CODIS Brochure (Brochure) <http://www.fbi.gov/about-us/lab/biometric-analysis/codis/codis_brochure> [as of Dec. 1, 2014].) All three database levels work together to match DNA profiles.

DNA databanks are growing rapidly. As of September 2014, NDIS contained over 11,164,117 offender profiles, 20,267,611 arrestee profiles and 583,444 forensic profiles. (CODIS-NDIS Statistics (Statistics) < http://www.fbi.gov/about-us/lab/biometric-analysis/codis/ndis-statistics>.) The FBI states that "[t]hrough the combination of increased Federal funding and expanded database laws, the number of profiles in NDIS continues to increase dramatically." (Brochure, *supra,* <http://www.fbi.gov/about-us/lab/biometric-analysis/codis/codis_brochure.) As of September 2014, CODIS had produced over 261,703 "hits" (identifying a potential suspect or linking multiple crime scenes), assisting in more than 250,230 investigations nationwide. (Statistics, *supra*, <http://www.fbi.gov/about-us/lab/biometric-analysis/codis/ndis-statistics>; Fact Sheet, *supra,* <http://www.fbi.gov/about-us/lab/biometric-analysis/codis/codis-and-ndis-fact-sheet>.) As of September 30, 2014, the California DNA Data Bank Program (CAL-DNA) contained 2,327,610 DNA samples received and logged, and 2,327,610 subject profiles uploaded pursuant to section 296. (California Department of Justice Proposition 69 DNA Data Bank Program Report for

accessed by local, state and federal law enforcement agencies and officials. (Brochure, *supra,* <http://www.fbi.gov/about-us/lab/biometric-analysis/codis/codis_brochure>; FAQ, *supra*, Searching the CAL-DNA Data Bank and CODIS <http://oag.ca.gov/bfs/ prop69/faqs>.) When a DNA profile is uploaded, it is compared to profiles contained in the Convicted Offender and Arrestee Indices; if there is a "hit," the laboratory conducts procedures to confirm the match and, if confirmed, obtains the identity of the suspect. (Fact Sheet, *supra,* <http://www.fbi.gov/about-us/lab/biometric-analysis/codis/codis-and-ndis-fact-sheet>.) The uploaded profile is also compared to crime scene profiles contained in the Forensic Index; again, if there is a hit, the match is confirmed by the laboratory. (*Ibid.*) CODIS also performs weekly searches of the entire system. (The FBI and DNA, Part 1 <http://www.fbi.gov/news/stories/2011/november/dna_112311>.) In CODIS, the profile does not include the name of the person from whom the DNA was collected or any case related information, but only a specimen identification number, an identifier for the agency that provided the sample, and the name of the personnel associated with the analysis. (Fact Sheet, *supra,* <http://www.fbi.gov/about-us/lab/biometric-analysis/codis/codis-and-ndis-fact-sheet>.)

The DNA Act specifies that samples and profiles may be released only to law enforcement personnel and contains penalties for unauthorized use or disclosure of DNA information. (§ 299.5, subds. (f), (i).) A person whose DNA profile has been included in the state data bank may have his or her DNA specimen and sample destroyed, and database profile expunged from the data bank program, if he or she "has no past or present offense or pending charge which qualifies that person for inclusion within the . . . Data Bank Program and there otherwise is no legal basis for retaining the specimen or sample or searchable profile." (§ 299, subd. (a).)

The expungement process, however, is neither quick nor guaranteed. An arrestee may request expungement if the relevant charges are dropped before adjudication, after

---

Third Quarter 2014 (DOJ Report) <http://oag.ca.gov/sites/all/files/agweb/pdfs/bfs/ quarterlyrpt_3q_2014.pdf?>.) As of that date, the California DOJ reported 36,031 total hits, and 40,813 investigations aided. (*Ibid.*)

the statute of limitations for filing an accusatory pleading has run, or after being found factually innocent or not guilty of the offense. (§ 299, subds. (b)(1), (b)(3), (b)(4).) The arrestee must submit a request to the trial court and prosecutor of the county where the arrest occurred and to the DOJ's DNA Laboratory; the court must then wait 180 days before it can grant the request; the court has discretion to grant or deny the request and its order is not reviewable by appeal or by writ. (§§ 299, subds. (c)(1), (c)(2)(D).)[4] The

---

[4] Section 299, subdivision (c)(2), provides: "Except as provided below, the Department of Justice shall destroy a specimen and sample and expunge the searchable DNA database profile pertaining to the person who has no present or past qualifying offense of record upon receipt of a court order that verifies the applicant has made the necessary showing at a noticed hearing, and that includes all of the following:

"(A) The written request for expungement pursuant to this section.

"(B) A certified copy of the court order reversing and dismissing the conviction or case, or a letter from the district attorney certifying that no accusatory pleading has been filed or the charges which served as the basis for collecting a DNA specimen and sample have been dismissed prior to adjudication by a trier of fact, the defendant has been found factually innocent, the defendant has been found not guilty, the defendant has been acquitted of the underlying offense, or the underlying conviction has been reversed and the case dismissed.

"(C) Proof of written notice to the prosecuting attorney and the Department of Justice that expungement has been requested.

"(D) A court order verifying that no retrial or appeal of the case is pending, that it has been at least 180 days since the defendant or minor has notified the prosecuting attorney and the Department of Justice of the expungement request, and that the court has not received an objection from the Department of Justice or the prosecuting attorney."

An individual may initiate expedited expungement proceedings by filing a request form and "sufficient supporting documentation of his/her identity, legal status, and criminal history" with the DOJ DNA Database Program. (<http://ag.ca.gov/bfs/pdf/ expungement_app_instruc.pdf> [as of Dec. 1, 2014].) Depending on the grounds for expungement, the required documentation may be a letter in support of expungement from a district attorney or prosecutor, or a certified or file-stamped copy of a court order, opinion, docket, or minute order. (Streamlined DNA Expungement Application Form 244 <http://ag.ca.gov/bfs/pdf/expungement_app.pdf>) If DOJ denies the request, the individual may initiate a court proceeding pursuant to the section 299 procedures. (<http://ag.ca.gov/bfs/pdf/expungement_app_instruc.pdf>)

DNA Act appears to allow the prosecutor to prevent expungement merely by objecting to the request.  (§299, subd. (c)(2)(D).)

## II.

### *The Fourth Amendment and Maryland v. King*

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." (U.S. Const., Amend. IV.)  Subject only to a few specifically established and well-delineated exceptions not applicable here, warrantless searches are per se unreasonable under the Fourth Amendment (*Missouri v. McNeely* (2013) ___ U.S. ___, 133 S.Ct. 1552, 1558; *City of Ontario v. Quon* (2010) 560 U.S. 746, 760); the state thus bears the burden of showing that the search at issue is reasonable and therefore constitutional.  (*People v. Williams* (1999) 20 Cal.4th 119,127.)  " 'As the text of the Fourth Amendment indicates, the ultimate measure of the constitutionality of a governmental search is "reasonableness." ' (*Vernonia School Dist. 47J v. Acton* (1995) 515 U.S. 646, 652.) [¶] 'Reasonableness . . . is measured in objective terms by examining the totality of the circumstances' (*Ohio v. Robinette* (1996) 519 U.S. 33, 39), and 'whether a particular search meets the reasonableness standard " 'is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests.' " ' (*Vernonia School Dist. 47J* . . . at pp. 652–653; see also *Samson v. California* (2006) 547 U.S. 843, 848 (*Samson*).)" (*People v. Robinson* (2010) 47 Cal.4th 1104, 1120.)

Nonconsensual extractions of substances that may be used for DNA profiling are "searches" entitled to the protection of the Fourth Amendment.  (*King, supra,* 133 S.Ct.

---

The DOJ posts monthly statistics for the DNA Laboratory which indicate the number of samples removed from the backlog.  As the number of samples removed includes "any samples Expunged, Removed or Failed twice, as well as where a New Sample has been requested," it does not reveal how many samples were expunged or how many profiles eligible for expungement exist in the databank.  (Jan Bashinski DNA Laboratory Monthly Statistics <http://ag.ca.gov/sites/all/files/agweb/pdfs/bfs/monthly_october_2014.pdf?>.)

9

at p. 1969 [buccal swab]; *Schmerber v. California* (1966) 384 U.S. 757, 767-771 (*Schmerber*) [blood]; *People v. Robinson, supra*, 47 Cal.4th at p. 1119 [blood]; *Skinner v. Railway Labor Executives' Assn.* (1989) 489 U.S. 602, 616-617 [breathalyzer and urine sample]; *Cupp v. Murphy* (1973) 412 U.S. 291, 295 [finger nail scrapings].) The physical intrusion involved in the buccal swab procedure used in the present case has been viewed as minimal. (*King,* at p. 1969.) The collection of the DNA sample, however, is only the first part of the search authorized by the DNA Act; the second occurs when the DNA sample is analyzed and a profile created for use in state and federal DNA databases. The latter search is the true focus of our analysis.

Federal and state statutes authorizing collection of DNA samples from persons *convicted* of qualifying offenses have been upheld universally by federal and state courts, albeit with significant debate and disagreement among the judges who decided these cases. (E.g., *Banks v. United States* (10th Cir. 2007) 490 F.3d 1178; *United States v. Weikert* (1st Cir. 2007) 504 F.3d 1; *United States v. Amerson* (2nd Cir. 2007) 483 F.3d 73; *United States v. Hook* (7th Cir. 2006) 471 F.3d 766; *Johnson v. Quander* (D.C. Cir. 2006) 440 F.3d 489; *United States v. Conley* (6th Cir. 2006) 453 F.3d 674; *United States v. Kraklio* (8th Cir. 2006) 451 F.3d 922; *United States v. Sczubelek* (3rd Cir. 2005) 402 F.3d 175; *Groceman v. U.S. Dept. of Justice* (5th Cir. 2004) 354 F.3d 411; *United States v. Kincade* (9th Cir. 2004) 379 F.3d 813 (*Kincade*); *Wilson v. Collins* (6th Cir. 2008) 517 F.3d 421 [Ohio]; *Nicholas v. Goord* (2nd Cir. 2005) 430 F.3d 652 [New York]; *Padgett v. Donald* (11th Cir. 2005) 401 F.3d 1273 [Georgia]; *Green v. Berge* (7th Cir. 2004) 354 F.3d 675 [Wisconsin]; *Rise v. Oregon* (9th Cir. 1995) 59 F.3d 1556 (*Rise*) [Oregon]; *Jones v. Murray* (4th Cir. 1992) 962 F.2d 302 [Virginia]; *People v. Robinson, supra,* 47 Cal.4th at p. 1121; *State v. Hutchinson* (2009) 2009 ME 44, 969 A.2d 923, 932; *State v. Martin* (2008) 184 Vt. 23, 46, 955 A.2d 1144; *State v. Bartylla* (Minn. 2008) 755 N.W.2d 8, 18; *State v. O'Hagen* (2007) 189 N.J. 140, 914 A.2d 267, 280-281.)

These cases emphasize, on the one hand, that convicted offenders are subject to "a 'broad range of [restrictions] that might infringe constitutional rights in free society' " and have "severely constricted expectations of privacy relative to the general citizenry"

10

(*Kincade, supra,* 379 F.3d at pp. 833-834; see *United States v. Kriesel* (9th Cir. 2007) 508 F.3d 941, 947 (*Kriesel*)), including no reasonable expectation of privacy in their identity. (*Kincade,* at p. 837; *Kriesel,* at p. 947; *Hamilton v. Brown* (9th Cir. 2010) 630 F.3d 889, 895; *Rise, supra,* 59 F.3d at p. 1560; *People v. Robinson, supra,* 47 Cal.4th at p. 1121.) On the other hand, the government has a strong interest in identifying and prosecuting offenders and, in the case of those on supervised release, promoting rehabilitation and protecting the community. (*Kincade,* at pp. 833-835 [parolee]; *Kriesel,* at p. 947 [probationer]; *Hamilton,* at pp. 895-896 [inmate].) Accurate identification has been viewed as serving the governmental purposes of returning conditional releasees to prison if they reoffend, reducing recidivism through the deterrent effect of DNA profiling, and solving past crimes (*Kincade,* at pp. 838-839; *Kriesel,* at pp. 949-950), as well as avoiding erroneous convictions (*People v. Robinson,* at p. 1121).

In *King*, the United States Supreme Court moved beyond the realm of convicted offenders, rejecting a Fourth Amendment challenge to a Maryland statute requiring collection of DNA from arrestees charged with "serious crimes." (*King, supra,* 133 S.Ct. at p. 1970.) *King* described the "legitimate government interest" served by the Maryland DNA law as "the need for law enforcement officers in a safe and accurate way to process and identify the persons and possessions they must take into custody." (*Ibid*.) The court viewed a suspect's "identity" as including not only "his name or Social Security number" but also his or her criminal history, the latter being "critical" for the police to know when processing a suspect for detention because "[i]t is a common occurrence that '[p]eople detained for minor offenses can turn out to be the most devious and dangerous criminals.' " (*Id.* at p. 1971.) For this purpose, the court stated, "the only difference between DNA analysis and the accepted use of fingerprint databases is the unparalleled accuracy DNA provides." (*Id.* at p. 1972.) "DNA is another metric of identification used to connect the arrested with his or her public persona, as reflected in records of his or her actions that are available to the police," producing "a more comprehensive record of the suspect's complete identity." (*Ibid.*)

11

Employing this definition of "identity," the court saw DNA identification of arrestees as helping ensure safety in a custodial setting by allowing law enforcement officers to "know the type of person whom they are detaining" and "make critical choices about how to proceed." (*King, supra,* 133 S.Ct at p. 1972.) DNA information could help law enforcement assure an arrestee's availability for trial by indicating arrestees who had committed more serious offenses in the past and might be more inclined to flee in order to avoid investigation that could expose the other offenses. (*Id.* at pp. 1972-1973.) The information could also inform bail decisions, because an arrestee's "past conduct is essential to an assessment of the danger he poses to the public." (*Id.* at p. 1973.) Acknowledging that it may take some time to obtain the results of DNA testing, the court observed that actual release often does not occur for a considerable time after the decision to release is made, information about the arrestee's "identity and background" could be relevant to conditions of release or reconsideration of the decision to release, and DNA results obtained after release on bail could lead to revocation. (*Id.* at pp. 1973-1974.) Finally, the court noted that identification of an arrestee as the perpetrator of another crime could result in freeing a different person wrongfully imprisoned for that other offense. (*Id.* at p. 1974.)

On the other side of the balance, the court held that the privacy expectations of a person taken into police custody " 'necessarily [are] of a diminished scope.' " (*King, supra,* 133 S.Ct. at p. 1978, quoting *Bell v. Wolfish* (1979) 441 U.S. 520, 557.) "Once an individual has been arrested on probable cause for a dangerous offense that may require detention before trial, . . . his or her expectations of privacy and freedom from police scrutiny are reduced." (*King,* at p. 1978.) After finding the physical intrusion imposed by buccal swab minimal (*id.* at p. 1979), the court offered three reasons for concluding that the processing of the DNA sample did not intrude upon privacy rights in an unconstitutional manner: Only noncoding portions of the arrestee's DNA, which would not reveal genetic traits, were analyzed; even if additional information could be gleaned from the DNA tested, the DNA was not in fact tested for such purposes; and testing for any purpose other than identification was prohibited. (*Id.* at pp. 1979-1980.)

12

In sum, the court held, "In light of the context of a valid arrest supported by probable cause respondent's expectations of privacy were not offended by the minor intrusion of a brief swab of his cheeks. By contrast, that same context of arrest gives rise to significant state interests in identifying respondent not only so that the proper name can be attached to his charges but also so that the criminal justice system can make informed decisions concerning pretrial custody. Upon these considerations the Court concludes DNA identification of arrestees is a reasonable search that can be considered part of a routine booking procedure. When officers make an arrest supported by probable cause to hold for a serious offense and they bring the suspect to the station to be detained in custody, taking and analyzing a cheek swab of the arrestee's DNA is, like fingerprinting and photographing, a legitimate police booking procedure that is reasonable under the Fourth Amendment." (*King, supra,* 133 S.Ct. at p. 1980.)

In a piercing dissent, Justice Scalia explained for himself and the three other dissenting Justices that the *King* majority's interpretation of the Fourth Amendment departed markedly from prior Fourth Amendment jurisprudence by allowing the search of a person for evidence of a crime for which he or she has not been arrested, in the absence of any reason to think the person is guilty of any such other crime, possesses any incriminating evidence or presents any safety risk. The historical prohibition of such a search "is categorical and without exception; it lies at the very heart of the Fourth Amendment. Whenever this court has allowed a suspicionless search, it has insisted upon a justifying motive apart from the investigation." (*King, supra,* 133 S.Ct. at p. 1980 (dis. opn. of Scalia, J.).)

Justice Scalia elaborated: "As ratified, the Fourth Amendment's Warrant Clause forbids a warrant to 'issue' except 'upon probable cause,' and requires that it be 'particula[r]' (which is to say, *individualized*) to 'the place to be searched, and the persons or things to be seized.' And we have held that, even when a warrant is not constitutionally necessary, the Fourth Amendment's general prohibition of " 'unreasonable' searches imports the same requirement of individualized suspicion. See *Chandler v. Miller* [(1997)] 520 U.S. 305, 308.

"Although there is a 'closely guarded category of constitutionally permissible suspicionless searches,' *id*., at 309, that has never included searches designed to serve 'the normal need for law enforcement[.]' *Skinner v. Railway Labor Executives' Assn.*[, *supra,*] 489 U.S. [at p.] 619 (internal quotation marks omitted)  Even the common name for suspicionless searches—'special needs' searches—itself reflects that they must be justified, *always*, by concerns 'other than crime detection.' *Chandler, supra*, at 313–314. We have approved random drug tests of railroad employees, yes—but only because the Government's need to 'regulat[e] the conduct of railroad employees to ensure safety' is distinct from 'normal law enforcement.' *Skinner, supra*, at 620.  So too we have approved suspicionless searches in public schools—but only because there the government acts in furtherance of its 'responsibilities . . . as guardian and tutor of children entrusted to its care.' *Vernonia School Dist. 47J v. Acton*[, *supra,*] 515 U.S. [at p.] 665.

"So while the Court is correct to note (*ante*, at 1969 – 1970) that there are instances in which we have permitted searches without individualized suspicion, '[i]n none of these cases . . . did we indicate approval of a [search] whose primary purpose was to detect evidence of ordinary criminal wrongdoing.' *Indianapolis v. Edmond* [(2000)] 531 U.S. 32, 38.  That limitation is crucial.  It is only when a governmental purpose aside from crime-solving is at stake that we engage in the free-form 'reasonableness' inquiry that the Court indulges at length today.  To put it another way, both the legitimacy of the Court's method and the correctness of its outcome hinge entirely on the truth of a single proposition:  that the primary purpose of these DNA searches is something other than simply discovering evidence of criminal wrongdoing.  As I detail below, that proposition is wrong.

"The Court alludes at several points (see *ante*, at 1970-1971, 1978-1979) to the fact that King was an arrestee, and arrestees may be validly searched incident to their arrest.  But the Court does not really rest on this principle, and for good reason:  The objects of a search incident to arrest must be either (1) weapons or evidence that might easily be destroyed, or (2) evidence relevant to the crime of arrest.  See *Arizona v. Gant*

[(2009)] 556 U.S. 332, 343–344; *Thornton v. United States* [(2004)] 541 U.S. 615, 632 (Scalia, J., concurring in judgment). Neither is the object of the search at issue here. [¶] . . . [¶]

"At any rate, all this discussion is beside the point. No matter the degree of invasiveness, suspicionless searches are *never* allowed if their principal end is ordinary crime-solving. A search incident to arrest either serves other ends (such as officer safety, in a search for weapons) or is not suspicionless (as when there is reason to believe the arrestee possesses evidence relevant to the crime of arrest)." (*King, supra,* 133 S.Ct. at pp. 1981-1982 (dis. opn. of Scalia, J.).)

The *King* dissenters highlighted critical issues we will return to later in this opinion, in particular the court's novel view of identification and its acceptance of the analogy between DNA testing and fingerprinting. Even aside from criticism of the court's underlying assumptions, however, we find it difficult to view *King* as controlling the outcome of the present case because of significant differences between the California DNA Act and the Maryland law. These include that the DNA Act applies to persons arrested for *any* felony, requires immediate collection and analysis of arrestees' DNA even before a judicial determination of probable cause, and does not provide for automatic expungement of DNA data if an arrestee is not in fact convicted of a qualifying crime. While judicial opinions do not ordinarily indicate their applicability to disputes arising under different statutes or presenting different facts, the *King* majority stated its intention to create a rule of national application despite acknowledging differences in the "particulars" of various states' DNA testing statutes. (*King, supra,* 133 S.Ct. at p. 1968.)[5] But it did so apparently without considering the ramifications of such differences, several

---

[5] Noting that "[t]wenty-eight States and the Federal Government have adopted laws similar to the Maryland Act authorizing the collection of DNA from some or all arrestees," the court stated that "[a]lthough those statutes vary in their particulars, such as what charges require a DNA sample, their similarity means that this case implicates more than the specific Maryland law. At issue is a standard, expanding technology already in widespread use throughout the Nation." (*King, supra,* 133 S.Ct. at p. 1968.)

of which render its reasons for upholding the Maryland law completely inapplicable to California's.

The difference between the statutes in the timing of DNA analysis has several implications. While the Maryland law does not permit a DNA sample to be processed until after a judicial officer makes a probable cause determination and the arrestee is charged with a qualifying crime (*King, supra,* 133 S.Ct. at p. 1967), California's DNA Act requires that DNA be collected "as soon as administratively practicable after arrest" (§ 296.1, subd. (a)(1)(A)) and permits processing of the sample to begin immediately. This means that the arrestee's DNA may be processed on the basis of an arresting officer's designation of the alleged crime, even if he or she is never charged with a qualifying—or indeed *any*—crime, and despite the fact that, because of the length of time necessary for processing a DNA sample, the DNA information will not be available for any of the purposes discussed in *King* before the arrestee is either released or arraigned. For individuals who are formally charged with a qualifying offense, the information will rarely be available materially sooner as a result of collection immediately upon arrest than it would be if collected upon arraignment. Yet the privacy expectations of a pre-arraignment arrestee are higher than those of an individual who has been subjected to a judicial determination of probable cause, and permitting DNA collection on the basis of an arresting officer's determination of the crime increases the potential for abuse. *King* considered none of these issues.

In addition, the difference in expungement provisions affects the weight of the arrestee's privacy interests. Unlike the automatic expungement provisions of the Maryland law, California puts the burden on the arrestee to seek expungement, and outcome of the expungement process is not guaranteed. As the likelihood of expungement decreases, or the length of time necessary to obtain expungement increases, the privacy intrusion imposed by the government's retention of the DNA profile and sample increases.

Another difference between the statutes is that Maryland expressly prohibits familial DNA searches—searches in which a partial match between an individual's DNA

16

profile and a profile in the DNA database is used to implicate a close biological relative of the DNA donor as a possible criminal suspect. (*King, supra,* 133 S.Ct. at p. 1967; Md. Pub. Saf. Code Ann. § 2-506(d).) California does not. As we later discuss, this difference is significant because familial DNA searching has *nothing* to do with "identifying" the DNA donor and has no use other than criminal investigation. At present, as a matter of policy, California limits familial DNA searches to DNA from convicted offenders. But this restriction is not imposed by the DNA Act.

The DNA Act also differs from the Maryland law in that it applies to all felony arrestees rather than a subset limited by the serious nature of the crime of arrest. This difference further demonstrates that the purpose of the DNA Act is investigation of crime, not identification of arrestees. As Justice Scalia pointed out, the *King* majority describes its decision as applicable to persons arrested for *serious* offenses, but its logic would apply to any and every arrestee. "If one believes that DNA will 'identify' someone arrested for assault, he must believe that it will 'identify' someone arrested for a traffic offense. . . . When there comes before us the taking of DNA from an arrestee for a traffic violation, the Court will predictably (and quite rightly) say, 'We can find no significant difference between this case and *King*.' Make no mistake about it: As an entirely predictable consequence of today's decision, your DNA can be taken and entered into a national DNA database if you are ever arrested, rightly or wrongly, and for whatever reason." (*King, supra,* 133 S.Ct. at p. 1989 (dis. opn. of Scalia, J.).) The more minor the crime of arrest, the more obvious it is that DNA is collected not to protect against some hidden risk to be discovered in "identifying" the arrestee, but to add to the database in furtherance of future crime-solving.

In our view, the differences between the California and Maryland DNA laws significantly alter the weight of the governmental interests and privacy considerations to be balanced in determining constitutionality under the Fourth Amendment. We need not decide whether these differences require a different resolution of the issue from that of the *King* majority, however, as we focus our analysis instead upon the California

17

Constitution.[6] Our conclusion that the DNA Act is invalid under article I, section 13, of the California Constitution renders it academic whether the Act is also invalid under the Fourth Amendment.

## III.

### *The DNA Act's Arrestee Provisions Violate the California Constitution*

Like the Fourth Amendment, article I, section 13, provides, "The right of the people to be secure in their persons, houses, papers, and effects against unreasonable seizures and searches may not be violated; and a warrant may not issue except on probable cause, supported by oath or affirmation, particularly describing the place to be searched and the persons and things to be seized." Despite the all but identical language of the two constitutional provisions, the California Supreme Court has not always interpreted them as coextensive. Rather, the court has held that in this area, as in other

---

[6] The California DNA Act was challenged in federal court, in a class action on behalf of persons who had been or would be compelled to submit to DNA searches solely because they have been arrested for or charged with a felony offense. (*Haskell v. Harris* (9th Cir. 2014) 745 F.3d 1269, 1270.) Prior to *King*, the district court denied a motion for a preliminary injunction. (*Haskell v. Brown* (N.D. Cal. 2009) 677 F.Supp.2d 1187, 1189-1190.) After *King* was decided, in a four-paragraph per curiam opinion, the Ninth Circuit affirmed the district court, finding the plaintiffs could not show they would likely succeed on the merits. (*Haskell v. Harris,* at p. 1271.) The full explanation of this conclusion is as follows: "Plaintiffs' facial and as-applied challenges turn on essentially the same question: Is California's DNA collection scheme constitutional as applied to *anyone* 'arrested for, or charged with, a felony offense by California state or local officials?' After . . . *King*[, *supra*,] 133 S. Ct. 1958, the answer is clearly yes. Plaintiffs' counsel conceded as much at oral argument. Given that concession, plaintiffs cannot show that the district court abused its discretion in denying a preliminary injunction that would apply to the entire class." (*Ibid.*) The court declined the plaintiffs' request for a preliminary injunction applying to a smaller class of individuals arrested for certain felonies that plaintiffs believed to be covered by *King*, directing that such a request would need to be made to the district court in the first instance. (*Ibid.*)

*Haskell v. Harris, supra,* 745 F.3d 1269 does not compel us to reach any particular resolution of the present case. First, *Haskell* did not adjudicate the constitutionality of the DNA Act; it only held that plaintiffs were not entitled to a preliminary injunction. Second, even with respect to a Fourth Amendment analysis, decisions of the Ninth Circuit are persuasive authority but not binding upon California state courts. (*Raven v. Deukmejian* (1990) 52 Cal.3d 336, 352 (*Raven*).)

18

constitutional analysis, the California Constitution is "a document of independent force." (*People v. Brisendine* (1975) 13 Cal.3d 528, 549-550 (*Brisendine*); see, *People v. Fields* (1996) 13 Cal.4th 289, 298 [double jeopardy]; *American Academy of Pediatrics v. Lungren* (1997) 16 Cal.4th 307, 325-326 (*American Academy*) [privacy].)  Further, the California Supreme Court has held that article I, section 13 imposes a " 'more exacting standard for cases arising within this state' " than does the Fourth Amendment.  (*People v. Ruggles* (1985) 39 Cal.3d 1, 11-12 (*Ruggles*), quoting *Brisendine,* at p. 545.)

While our Supreme Court has recognized a "*general* principle or policy of deference to United States Supreme Court decisions" in interpreting provisions of the California Constitution that are textually parallel to those of the federal Constitution (*Raven, supra,* 52 Cal.3d at p. 353), "even when the terms of the California Constitution are textually identical to those of the federal Constitution, the proper interpretation of the state constitutional provision is not invariably identical to the federal courts' interpretation of the corresponding provision contained in the federal Constitution.  (See, e.g., *Raven*[, at pp,], 352-354; *Brisendine, supra*, 13 Cal. 3d [at pp.] 548-551.)" (*American Academy, supra,* 16 Cal.4th at pp. 325-326.)  Deference is not required when " 'cogent reasons,' 'independent state interests,' or 'strong countervailing circumstances' that might lead our courts to construe similar state constitutional language differently from the federal approach." (*Raven,* at p. 353.)  And where California authority establishes that the California Constitution provides greater protection, the United States Supreme Court's interpretation of a textually parallel provision of the federal Constitution does not require our courts to weaken rights under the state Constitution. (*American Academy,* at p. 328.)  The California Supreme Court "sits 'as a court of last resort [in interpreting state constitutional guaranties], subject only to the qualification that our interpretations may not restrict the guarantees accorded the national citizenry under the federal charter.' " (*Raven,* at p. 354, quoting *People v. Longwill* (1975) 14 Cal.3d 943, 951, fn. 4.)

This point is made explicit in our state Constitution:  "Rights guaranteed by this Constitution are not dependent on those guaranteed by the United States Constitution."

(Cal. Const., art. I, § 24.)  Added to the Constitution by initiative in 1974, this provision did not create a new principle but, rather, "made explicit a preexisting fundamental principle of constitutional jurisprudence (see Ballot Pamp., Proposed Stats. and Amends. to Cal. Const. with arguments to voters, Gen. Elec. (Nov. 5, 1974), analysis by Legislative Analyst, p. 26)[.]" (*Raven, supra,* 52 Cal.3d at p. 354; *Brisendine, supra,* 13 Cal.3d at p. 551 and fn. 19.)

Indeed, as our Supreme Court has explained, the independence of state Constitutions is fundamental to principles of federalism and demonstrated by history. (*Brisendine, supra,* 13 Cal.3d at pp. 549-550.)  "It is a fiction too long accepted that provisions in state Constitutions textually identical to the Bill of Rights were intended to mirror their federal counterpart.  The lesson of history is otherwise:  the Bill of Rights was based upon the corresponding provisions of the first state Constitutions, rather than the reverse." (*Id.* at p. 550; see *People v. Monge* (1997) 16 Cal.4th 826, 872 (dis. opn. of Werdegar, J.).)  "The federal Constitution was designed to guard the states as sovereignties against potential abuses of centralized government; state charters, however, were conceived as the first and at one time the only line of protection of the individual against the excesses of local officials." (*Brisendine,* at p. 550.)  Thus the *Brisendine* court stated that "in determining that California citizens are entitled to greater protection under the California Constitution against unreasonable searches and seizures than that required by the United States Constitution," it was "simply reaffirming a basic principle of federalism—that the nation as a whole is composed of distinct geographical and political entities bound together by a fundamental federal law but nonetheless independently responsible for safeguarding the rights of their citizens." (*Id.*, at pp. 550-551.)

Our Supreme Court has enumerated several factors to consider in deciding whether a provision of the state Constitution should be construed differently from a parallel provision of the federal Constitution.  In *People v. Teresinski* (1982) 30 Cal.3d 822, the court set out four reasons for deciding *not* to depart from the United States Supreme Court's construction of the federal free speech clause:  "*First*, 'nothing in the

20

language or history of the California' constitutional provision in question 'suggest[ed] that the issue before us should be resolved differently than under' the analogous federal constitutional 'provision.' ([*Teresinski*], at p. 836.) *Second,* the decision in question 'did not overrule past precedent or limit previously established rights under' the United States Constitution. ([*Teresinski*], at p. 836.) *Third,* the decision 'was unanimous, and ha[d] not inspired extensive criticism.' (*Id.* at pp. 836-837.) *Fourth,* the decision, 'if followed by the courts of this state, would not overturn established California doctrine affording greater rights' in the particular area. (*Id.* at p. 837.)" (*Gerawan Farming, Inc.* v. *Lyons* (2000) 24 Cal.4th 468, 510-511.)

These factors all militate against applying *King's* analysis in the present case.

First, as we have said, the California Supreme Court has historically construed article I, section 13, of the California Constitution as imposing a "more exacting standard" than the Fourth Amendment in general, and specifically with respect to the scope of permissible searches of arrestees. (*Brisendine, supra,* 13 Cal.3d at p. 545; *People v. Norman* (1975) 14 Cal.3d 929, 938-939; *Ruggles, supra,* 39 Cal.3d at pp. 11-12.) Second, while *King*—being a case of first impression—did not overrule past precedent or limit previously established rights, as Justice Scalia forcefully described, the majority opinion deviated sharply from prior Fourth Amendment jurisprudence on suspicionless searches and searches incident to arrest. Third, far from being unanimous, *King* was decided by a narrow majority of five justices, with four in dissent. Finally, although following *King* would not overturn established California doctrine affording greater rights—again, *King* being a case of first impression—it would run counter to our Supreme Court's prior application of a "higher standard of reasonableness under article I, section 13" (*Brisendine,* at p. 552), especially in the area of arrestee searches, and to California's express constitutional protection of informational privacy.[7]

---

[7] Respondent argues that appellant cannot prevail on a facial challenge to the DNA Act because, since *King* upheld DNA collection from arrestees at booking, appellant cannot demonstrate that "no set of circumstances exists under which the Act would be valid." (*United States v. Salerno* (1987) 481 U.S. 739, 745.) Appellant rejects

As we will explain, we find the *King* majority's view of the purpose of DNA testing thoroughly inapplicable to the California DNA Act, and the court's view of the information exposed through DNA testing too dismissive of scientific knowledge and practical considerations. For these reasons, we decline to adopt these views in analyzing the DNA Act under the California Constitution. Further, as we will also explain, the differences we have identified between the California and Maryland DNA laws decrease the weight attributable to the governmental interest in DNA testing at this early stage and, correspondingly, increase the weight of the privacy interests at stake. Accordingly, we find that the arrestee provisions of the California DNA Act do not pass muster under the California Constitution.

---

the "facial challenge" characterization, noting that he does not challenge the DNA Act in all its applications—such as its requirement of postconviction DNA testing. Instead, appellant asserts, he is challenging only the specific search demanded of him, after his arrest and before he was formally charged, his refusal of which led to his criminal conviction under section 298.1. We need not resolve this point. Whatever the merits of a facial challenge to appellant's Fourth Amendment claim, *King* would not foreclose appellant's challenge under the California Constitution.

Respondent contests appellant's right to pursue a claim under the California Constitution because it was not "developed" at trial or by his appointed counsel on appeal. Respondent urges that appellant's briefing initially "raised, but did not develop a state constitutional law claim," that respondent pointed out this failure to develop a state law claim and argued such a claim would not be decided differently from a Fourth Amendment claim, that appellant's appointed amicus then raised a state law claim, and that appellant's "substantial" state law claim was made for the first time only after the case was remanded by the Supreme Court. This attempt to avoid the merits is surprising considering the procedural history of the appeal. This court, of its own initiative, invited the First District Appellate Project (FDAP) to file an amicus brief on the initial appeal in order to have the issues more fully developed. FDAP'S brief addressed the California Constitution, as well as the Fourth Amendment, albeit focusing on article I, section 1. After FDAP's amicus brief was filed, FDAP was substituted as appellant's counsel. Although we chose to resolve the case on federal constitutional grounds at that time, there is no basis for respondent's attempt to prevent consideration of the issues under the California Constitution now. In any event, even if appellant had not earlier relied upon article I, section 13, we would not "ignore a constitutional provision directly applicable to an issue in a case before us simply because a party had neglected to cite it." (*People v. Runyan* (2012) 54 Cal.4th 849, 859, fn. 3.)

## A.

### *The DNA/Fingerprint Analogy*

The nature of the information at issue in DNA analysis is critical to assessment of the interests at stake in this case. Cases upholding DNA statutes invariably rely heavily on analogizing DNA testing to fingerprinting. (E.g., *Rise*, *supra*, 59 F.3d at p. 1559; *United States v. Amerson*, *supra*, 483 F.3d at p. 87.) *King* viewed DNA analysis simply as "an advanced technique superior to fingerprinting in many ways." (*King*, *supra*, 133 S.Ct. at p. 1976.) But "DNA contains an extensive amount of sensitive personal information beyond mere identifying information[.]" (*County of San Diego v. Mason* (2012) 209 Cal.App.4th 376, 381; see, Simoncelli, *Dangerous Excursions: The Case Against Expanding Forensic DNA Databases to Innocent Persons* (2006) 34 L.J. Med. & Ethics 390, 392 ["Unlike fingerprints—two-dimensional representations of the physical attributes of our fingertips that can only be used for identification—DNA samples can provide insights into personal family relationships, disease predisposition, physical attributes, and ancestry."]) A DNA sample contains the entire human genome, "the total of all that person's genetic information." (Greeley et al., *Family Ties* (2006) 34 J.L. Med. & Ethics 248, 249.)[8]

---

[8] The *King* court's minimizing of the nature and amount of information at issue in DNA analysis stands in stark contrast to its expansive view of the privacy interest involved in the recent case of *Riley v. California* (2014) ___ U.S. ___ [134 S.Ct. 2473]. There, in refusing to condone a warrantless search of data on an arrestee's cell phone, the court recognized that "the possible intrusion on privacy" required consideration of the amount and nature of information stored on a cell phone, which can include "photographs, picture messages, text messages, Internet browsing history, a calendar, a thousand-entry phone book, and so on." (*Id*. at p. 2489.) The court pointed out potential intrusions that could result from a data search with no indication they were involved in the particular case before the court: "An Internet search and browsing history, for example, can be found on an Internet-enabled phone and could reveal an individual's private interests or concerns—perhaps a search for certain symptoms of disease, coupled with frequent visits to WebMD." (*Id*. at p. 2490.) And the court pointed out that future technological developments would increase the problem: "We expect that the gulf between physical practicability and digital capacity will only continue to widen in the future." (*Id.* at p. 2489.)

In general, like *King*, the cases upholding mandatory collection and processing of DNA have unjustifiably dismissed concerns about the extent of the personal information contained in DNA samples by limiting their attention to the profile used in DNA databanks, as currently restricted by statutes and scientific capability. (See, *King, supra,* 133 S.Ct. at pp. 1979-1980.) We have already mentioned that California currently uses the information contained in DNA profiles for purposes other than identification in familial searches based on convicted offenders' DNA, a point we will discuss in detail later. The fact that investigators in California are able to conduct familial DNA searches—using the CODIS loci to discover a new suspect—disproves the *King* majority's assumption that "the CODIS loci come from noncoding parts of the DNA that do not reveal the genetic traits of the arrestee" and "alleles at the CODIS loci 'are not at present revealing information beyond identification.' [Citation.]" (*Id*. at p. 1979.) Familial searches also disprove the *King* majority's assumption that "even if non-coding alleles could provide some information," they " 'are not at present revealing information beyond identification.' [Citation.]" (*Ibid*.) While that may be true in Maryland, where familial searching is prohibited, it is demonstrably *untrue* in California. Notably, the *King* opinion added that if in the future police analyze samples to determine factors not relevant to identity, "that case would present additional privacy concerns not present here." (*Ibid*.) Such is the case in California.

But even accepting that the amount of personal information contained in the profile developed from noncoding portions of DNA is limited,[9] the far greater danger to

___

The court's approach in *King* could not have been more different. The *King* court avoided any acknowledgement of the personal nature of DNA information, limited its consideration of privacy interests to the specific search involved, overlooked scientific developments in DNA analysis expanding its investigative use to persons who are neither offenders nor even arrestees, disregarded potential scientific developments increasing the information extracted from DNA, and then broadly extended its decision to DNA laws even more intrusive than the one before the court.

[9] Questions about how much information may be derived from junk DNA now and in the future have been the subject of much debate in scientific and legal communities, and studies have begun to suggest links between the CODIS loci and

privacy lies in the DNA *samples* from which the CODIS profiles are developed, which, as we have said, contain the entire genome. DOJ's laboratory is required to collect and store the blood specimens, buccal swab samples and other biological samples from which DNA profiles are derived. (§§ 295, subds. (h), (i)(1)(C), 295.1, subd. (c).) Like the DNA laws of almost every other state and federal law,[10] the DNA Act is silent as to how long these specimens and samples may be kept, and it is reasonable to expect they will be preserved long into the future, when it may be possible to extract even more personal and private information than is now the case. "[T]he advance of science promises to make stored DNA only more revealing." (*Kincade*, *supra,* 379 F.3d at p. 842, fn. 3 (conc. opn. of Gould, J.).)

Moreover, as we will explain, the Act places few restrictions on the law enforcement uses to which such information may be put. (See discussion, *post*, at pp. 33-34.) This raises questions both about the kind of personal and private information that may be derived from the DNA samples in the DOJ's possession, and the uses of that biometric data as scientific developments increase the type and amount of information that can be extracted from it. For example, commentators have discussed the potential for research to identify genetic causes of antisocial behavior that might be used to justify various crime control measures. (See *Reclaiming "Abandoned" DNA, supra,* 100 Nw. U.

susceptibility to certain diseases, as well as family relationships and ancestry. (Cole, *Is The "Junk" DNA Designation Bunk?* (2007) 102 Nw. U. L.Rev. Colloquy 54; Rosen, *Liberty, Privacy, and DNA Databases,* The New Atlantis, Spring 2003 <http://www.thenewatlantis.com/publications/liberty-privacy-and-dna-databases>; Roman-Santos, *Concerns Associated with Expanding DNA Databases* (2010) 2 Hastings Sci. & Tech. L.J. 267, 291-292); Kaye, *What the Supreme Court Hasn't Told You About DNA Databases* (2013) p. 5 <http://www.promega.com/resources/profiles-in-dna/2013/what-the-supreme-court-hasnt-told-you-about-dna>.)

[10] Wisconsin apparently has been the only state whose DNA law requires the destruction of all specimens and samples after analysis has been performed and the applicable court proceedings have concluded. (Joh, *Reclaiming "Abandoned" DNA: The Fourth Amendment and Genetic Privacy* (2006) 100 Nw.U. L.Rev. 857, 871, fn. 77, citing Wis. Stat. Ann. § 165.77(3) (West 2004).) The Wisconsin statute was amended in 2013, however, to remove this requirement effective April 1, 2015. (Wis. Stat. Ann. § 165.77(3), Note (LEXIS 2014).)

L.Rev. at p. 878.)  One post-*King* commentator has stated, "Genetics already has the power to expose familial ties.  Research into still more sensitive information is ongoing, as briefs to the Court [in *King*] highlighted.  [Citing Brief for Genetic Scientists Robert Nussbaum and Sara H. Katsanis as Amici Curiae in Support of Respondent at pp. 31-32 and Brief of 14 Scholars of Forensic Evidence as Amici Curiae Supporting Respondent at pp. 38-39.]  Government health and science institutes fund innumerable studies of this kind, and the research arm of the DOJ itself is sponsoring research into the intersection of genetics and delinquency.  [Citing Kevin M. Beaver, Intersection of Genes, the Environment, and Crime and Delinquency: A Longitudinal Study of Offending (2010), available at <https://www.ncjrs.gov/app/publications/abstract.aspx?id=253671> (studying five genes for interactions).]  Academic and commercial sectors also actively pursue links between genetics and asocial behavior or addiction, and preliminary findings correlating one genetic variation with violence have recently been published.  [Citing Widom & Brzustowicz, *MAOA and the 'Cycle of Violence,'* 60 Biological Psychiatry 684 (2006) (citing studies of MAOA 'violence' gene) and Raine, The Anatomy of Violence: The Biological Roots of Crime (2013).]  If the 'pedophile gene' were found, or the 'violence gene' established, then surely law enforcement will seek to mine genetic information for that 'identification purpose.'  After all, law enforcement needs to know just whom it is dealing with." (Murphy, *License, Registration, Cheek Swab:  DNA Testing and the Divided Court* (2013) 127 Harv. L.Rev. 161, 180 (*DNA Testing*).)

Further, as familial DNA searching demonstrates, DNA can be used to incriminate persons other than the suspect or offender from whom it is taken, while the information derived from fingerprints is limited to that one individual.  In short, because the only information revealed by fingerprinting is a person's identity, and DNA analysis has the potential to reveal every aspect of the person's genetic make-up, fingerprinting presents no threat to privacy comparable to that posed by DNA analysis.[11]

---

[11] Another distinction significant in considering the privacy interests at stake is that DNA testing is viewed by society as a process reserved exclusively for criminals.  Because many professions and branches of civil service require fingerprinting, the

**B.**

*Identification and Investigation*

Like the four dissenting Justices in *King*, we are unwilling to accept the premises that analysis of arrestees' DNA is intended or in fact used for identification rather than investigation, or that "identification" encompasses investigating criminal history. The *King* majority's construction of a new governmental interest in "identity" that includes not only verification of who an arrestee is but also what that person has done in the past allowed the court to elevate the "governmental interest" side of the balance in weighing the law's promotion of "legitimate governmental interests" against its intrusion on arrestee's reasonable expectation of privacy. Because this definition of "identity" folds investigation into identity verification, and because DNA testing at the time of arrest does not further actual identity verification, the court's analysis distorted the "totality of the circumstances" required to be examined in measuring the reasonableness of the search at issue.

The premises that arrestees' DNA is used for identification and that identification includes criminal history permitted the *King* majority to view DNA testing of arrestees as falling within the established warrant exceptions for searches incident to arrest and booking. The result, as the dissenters explained, eviscerated protections against suspicionless searches long recognized under both the federal and state Constitutions. "The real expansion of warrantless search power in *King* is 'its reimagination of the idea of "identity" to include criminal history and other information.' " (*State v. Medina*

---

practice is "not in itself a badge of crime." (*United States v. Kelly* (1932) 55 F.2d 67, 70; see also *Thom v. New York Stock Exchange* (S.D.N.Y. 1969) 306 F.Supp. 1002, 1007 ["The day is long past when fingerprinting carried with it a stigma or any implication of criminality"].) In contrast, society views DNA sampling not just as a badge of crime, but as a badge of the most dangerous crimes: "DNA is used most commonly, both in the public perception and in reality, to detect more heinous crimes such as rape and murder." (Note, *Faulty Foundations: How the False Analogy to Routine Fingerprinting Undermines the Argument for Arrestee DNA Sampling* (2010) 19 Wm. & Mary Bill Rts. J. 475, 496 (*Faulty Foundations*).)

(2014) ___A.3d___ Vt. 69 [2014 Vt. LEXIS 71, *42] (*Medina*) quoting *DNA Testing*[*, supra,*] 127 Harv. L.Rev. at p. 177.)

The *King* court relied upon the principle that " '[t]he constitutionality of a search incident to an arrest does not depend on whether there is any indication that the person arrested possesses weapons or evidence. The fact of a lawful arrest, standing alone, authorizes a search.' " (*King, supra,* 133 S.Ct. at p. 1971, quoting *Michigan v. DeFillippo* (1979) 443 U.S. 31, 35.) And "[b]ecause proper processing of arrestees is so important and has consequences for every stage of the criminal process, the Court has recognized that the 'governmental interests underlying a station-house search of the arrestee's person and possessions may in some circumstances be even greater than those supporting a search immediately following arrest.' " (*King,* at p. 1974, quoting *Illinois v. Lafayette* (1983) 462 U.S. 640, 645.)

But, as Justice Scalia pointed out, the scope of a search incident to arrest is limited to weapons, easily destroyed evidence and evidence relevant to the crime of arrest. (*King, supra,* 133 S.Ct. at p. 1982 (dis. opn. of Scalia, J.), citing *Arizona* v. *Gant*, *supra*, 556 U.S. at pp. 343-344 and *Thornton* v. *United States*, *supra*, 541 U.S. at p. 632 (conc. opn. of Scalia, J.).) A booking search may further extend to an inventory of the suspect's personal effects. (*Illinois v. Lafayette, supra,* 462 U.S. at pp. 643-644.) An arrestee's DNA falls in none of these categories.

As Justice Scalia explained, it has been an established principle that warrantless searches without individualized suspicion may not be upheld where the " 'primary purpose' " of the search was " 'to detect evidence of ordinary criminal wrongdoing.' " (*King, supra,* 133 S.Ct. at pp. 1981-1982 (dis. opn. of Scalia, J.), quoting *City of Indianapolis v. Edmond, supra,* 531 U.S. at pp. 37-38, 44.) Justice Scalia noted that the DNA search in *King* served the purpose of " 'identifying' King" only if "what one means by 'identifying' someone is 'searching for evidence that he has committed crimes unrelated to the crime of arrest.' . . . If identifying someone means finding out what unsolved crimes he has committed, then identification is indistinguishable from the

28

ordinary law-enforcement aims that have never been thought to justify a suspicionless search." (*King,* at pp. 1982-1983 (dis. opn. of Scalia, J.).)

By common understanding, "identification" means verifying who a person is. The Oxford English Dictionary defines the term as the "action or process of determining what a thing is or who a person is." (5 Oxford English Dict. (2d ed. 1989) p. 619, col. 1.) In the context of fingerprinting, courts have drawn a distinction between identification— fingerprints taken "to verify that the person who is fingerprinted is really who he says he is," and investigation—fingerprints taken "to connect [the person fingerprinted] to a crime with which he was not already connected." (*United States v. Garcia-Beltran* (9th Cir. 2004) 389 F.3d 864, 867.) Fingerprints that are validly obtained for purposes of identification can later be used as evidence or in an investigation. (*Loder v. Municipal Court* (1976) 17 Cal.3d 859, 865.) Fingerprints obtained as a result of an illegal arrest are not subject to suppression if they were taken "solely to establish [the arrestee's] true identity." (*Garcia-Beltran,* at pp. 865-866.) But suppression *is* required if fingerprints were taken as a result of an illegal arrest for an " 'investigatory' purpose, *i.e.*, to connect [the arrestee] to alleged criminal activity . . . ." (*Id.* at p. 865; see *Hayes v. Florida* (1985) 470 U.S. 811; *Davis v. Mississippi* (1969) 394 U.S. 721.)

Identification in the sense of identity verification was from the outset the purpose of fingerprinting arrestees. The police began using fingerprinting as part of the booking process in the early 1900's, as a reliable way to identify arrestees at a time when identifying documents were easily forged (*Faulty Foundations, supra,*19 Wm. & Mary Bill Rts. J. at pp. 484-485) and "notoriety of the individual in the community [was] no longer a ready means of identification." (*United States v. Kelly*, *supra*, 55 F.2d at p. 69.)

The DNA collection and testing mandated by the DNA Act, however, does not serve this purpose, because DNA collected from an individual upon arrest cannot be used immediately to establish who that individual is. Before law enforcement can obtain information about an arrestee from DNA testing pursuant to the DNA Act, the DNA sample must be analyzed and a DNA profile created and run through a database. (CODIS Fact Sheet, *supra*, <http://www.fbi.gov/about-us/lab/biometric-analysis/codis/codis-and-

ndis-fact-sheet>.) The majority opinion in *King* noted the assertion in the amicus brief of the State of California that " 'DNA identification database samples have been processed in as few as two days in California, although around 30 days has been average.' " (*King, supra,* 133 S.Ct. at p. 1973.)[12] By contrast, fingerprints submitted electronically to the national fingerprint and criminal history system administered by the FBI yield a response in about 27 minutes. (Integrated Automated Fingerprint Identification System (IAFIS), Federal Bureau of Investigation <http://www.fbi.gov/about-us/cjis/ fingerprints_biometrics/iafis/iafis> [as of Dec. 1, 2014].)[13] Additionally, DNA profiles in the data bank are not identified by name or case information; after a hit is made, the law enforcement agency must contact the laboratory that submitted the DNA sample to obtain identifying information. (Fact Sheet, *supra*, <http://www.fbi.gov/about-us/lab/biometric-analysis/codis/codis-and-ndis-fact-sheet>.)

---

[12] The Attorney General's published monthly statistics for the state DNA laboratory suggest even longer processing times. In October 2014, the laboratory started with a backlog of 22,070 samples, added 12,204 samples and uploaded 9,815 profiles to CODIS. (Statistics, *supra* <http://oag.ca.gov/sites/all/files/agweb/pdfs/bfs/ monthly_october_2014.pdf?>) The numbers for prior months are similar. In September 2014, the starting backlog was 24,591 samples, 14,619 new samples were added and 16,987 profiles were uploaded. (Statistics, *supra* <http://oag.ca.gov/sites/all/files/agweb/ pdfs/bfs/monthly_september_2014.pdf?>) In June 2014, the starting backlog was 31,464 samples, 13,730 new samples were added, and 14,332 profiles were uploaded. (Statistics, *supra* <http://oag.ca.gov/sites/all/files/agweb/pdfs/bfs/monthly_june_2014.pdf?>.) Based on these numbers, it would take the laboratory well over two months to work through the existing backlog and begin to analyze newly received samples.

[13] Fingerprints and criminal history information from local, state and federal law enforcement agencies are compiled in the IAFIS, the "largest biometric database in the world," administered by the FBI. IAFIS offers automatic fingerprint search capability, latent search capability, electronic image storage, and electronic exchange of fingerprints and responses.

California uses the California Identification System (Cal-ID), the automated system maintained by the DOJ for retaining fingerprint files and identifying latent fingerprints. (Pen. Code, § 11112.1.) At the local level, live scan devices are used to capture fingerprints taken when an individual is booked and transmit them electronically to the DOJ, which then transmits them to the federal database. (See Orange County Crime Lab <http://www.occl.ocgov.com/Sections/CalID.aspx> [as of Dec. 1, 2014].)

California's protocol for DNA collection and analysis confirms that DNA is not used to verify who a person is. Far from relieving law enforcement agencies of the need to take fingerprints, the Act requires collection of a right thumb print and a full palm print of each hand, as well as a DNA sample. (§ 296, subd. (a)(2)(C).) Before collecting a DNA sample by means of the standard collection kit provided by the DOJ to local and state law enforcement agencies, the agency is required to "identify the subject" (FAQ, *supra*, Collection Mechanics, Ques. 1.1 <http://oag.ca.gov/bfs/prop69/faqs>), demonstrating that the immediate means of "identification" is *not* the subject's DNA.

Moreover, DNA samples are not taken from arrestees who have already had samples taken (FAQ, *supra,* Qualifying Offender Verification Criminal History Flags/Samples Taken, Rap Sheet "Flags" and Offender Verification <http://oag.ca.gov/bfs/prop69/faqs>), which shows that an arrestee's identity must be verified in some other fashion before a DNA sample can be collected. It also demonstrates that, as a practical matter, law enforcement agencies do not need or use the DNA taken at arrest for identification purposes.

That DNA testing is not needed to verify an arrestee's identity is unsurprising. Fingerprints can be and are used for this purpose; the only time DNA would be better suited or more accurate would be the very rare situation in which an arrestee has gone to the trouble of physically altering his or her fingerprints. In the words of the Vermont Supreme Court, "The current system of photographs and fingerprints fully responds to the need for identification of the defendant. In the many cases now consolidated in this appeal, the State has identified none in which there is a need for more accurate identification." (*Medina, supra,* 2014 Vt. LEXIS 71, *32.)

Not only are DNA profiles neither necessary nor helpful for verifying who a person is at the time of arrest, the fact that DNA testing *cannot* be used to immediately verify a person's true identity confirms that collection of a DNA sample at arrest has

another purpose.[14] Despite the language in the DNA Act limiting the use of DNA to "identification purposes" (§ 295.1, subd. (a)), it is apparent that Proposition 69—which was entitled the "DNA Fingerprint *Unsolved Crime* and Innocence Protection Act (italics added)—was designed to permit an arrestee's DNA to be used for investigative purposes. The ballot arguments in favor of the measure relied heavily on crime-solving promises and concerns, emphasizing the utility of DNA in investigating and solving crime.[15] Proponents asserted that " '[t]he chances of solving a rape or murder increase by 85% with an all-felon DNA database" and that taking a DNA sample at booking "is more efficient and helps police conduct accurate investigations. No wasting time chasing false

---

[14] Justice Scalia made this point: "To know [the actual workings of the DNA search at issue here] is to be instantly disabused of the notion that what happened had anything to do with identifying King." (*King*, *supra*, 133 S.Ct. at p. 1983 (dis. opn. of Scalia, J.).) In addition to the lengthy period before the DNA sample is processed and the fact that no identifying information is stored in the DNA database, "the CODIS system works by checking to see whether any of the samples in the Unsolved Crimes Collection match any of the samples in the Convict and Arrestee Collection. [Citation.] That is sensible, if what one wants to do is solve those cold cases, but note what it requires: that the identity of the people whose DNA has been entered in the Convict and Arrestee Collection already be known. If one wanted to identify someone in custody using his DNA, the logical thing to do would be to compare that DNA against the Convict and Arrestee Collection: to search, in other words, the collection that could be used (by checking back with the submitting state agency) to identify people, rather than the collection of evidence from unsolved crimes, whose perpetrators are by definition unknown. But that is not what was done. And that is because this search had nothing to do with identification." (*Id*. at pp. 1983-1985.) What the DNA search in *King* "identified" was the previously unidentified suspect in a prior unsolved crime, not the person from whom the sample was taken. (*Id*. at p. 1985.)

[15] The ballot argument opened dramatically: " '*In California, the remains of a boy missing for two decades are finally identified. Two cold murders are solved in Kansas. And in Texas, a serial sexual predator is captured. The cases are cracked thanks to technology police are calling the fingerprints of the 21st century.' (Associated Press, March 2004)* [¶] DNA IDENTIFIES CRIMINALS AND PROTECTS THE INNOCENT [¶] '*Hunch leads to Rape Suspect's Arrest; Detective obtains DNA sample from a convicted burglar that links him to attacks on 11 women.' (LA Times, April 2004).* [¶] '*DNA tests clear man of slayings; man jailed since late 2002 on charges of killing his ex-girlfriend and her sister.' (Bakersfield Californian, May 2004).*" (Ballot Pamp., Gen. Elec. (Nov. 2, 2004), argument in favor of Prop. 69, p. 62.)

leads . . . ." (*Id.* at p. 62-63.) According to proponents, "[Proposition] 69 can prevent thousands of crimes by taking dangerous criminals off the streets," and California's existing DNA database was "too small, unable to deal with the thousands of unsolved rapes, murders, and child abductions." (*Ibid.*)[16]

Although Proposition 69 twice declared the state's compelling interest in "accurate identification of criminal offenders," the findings section of the proposed law makes clear that its critical purpose was crime-solving. (Ballot Pamp., Gen. Elec. (Nov. 2, 2004), text of Prop. 69, p. 135.) The findings identified a "critical and urgent need" to furnish law enforcement "with the latest scientific technology available for accurately and expeditiously identifying, apprehending, arresting, and convicting criminal offenders and exonerating persons wrongfully suspected or accused of crime." (*Ibid.*) It was declared that law enforcement "should be able to use the DNA Database and Data Bank Program to substantially reduce the number of unsolved crimes; to help stop serial crime by quickly comparing DNA profiles of qualifying persons and evidence samples with as many investigations and cases as necessary to solve crime and apprehend perpetrators . . . ." (*Ibid.*) The findings stated that expansion of the DNA Database and Data Bank Program was "[t]he most reasonable and certain means" to solve crime effectively and to increase rapidly the number of "cold hits." (*Ibid.*)

Further, the text of the DNA Act does not restrict the investigatory uses to which DNA specimens, samples, and profiles may be put by law enforcement agencies. Despite the provision in the DNA Act that the DOJ "shall perform DNA analysis . . . only for identification purposes" (§ 295.1, subd. (a)), other provisions authorize release of DNA samples and profiles collected under the Act "to law enforcement agencies," including "district attorneys' offices and prosecuting city attorneys' offices" (§ 299.5, subd. (f)),

---

[16] To demonstrate the ineffectiveness of California's then-existing DNA database, proponents compared California's database to Virginia's. "Virginia has a comprehensive DNA database including arrestees. Virginia's population is less than Los Angeles County, but solves more crimes with DNA than California. In 2002, California solved 148 cases; Virginia 445." (Ballot Pamp., Gen. Elec. (Nov. 2, 2004), argument in favor of Prop. 69, p. 62.)

and, "*when, in the discretion of law enforcement*, disclosure is necessary because the DNA information pertains to the basis for law enforcement's identification, *arrest, investigation, prosecution, or exclusion of a particular person related to the case*[,]" DNA information may be released "to a jury or grand jury, or in a document filed with a court or administrative agency, or as part of a judicial or administrative proceeding," or may "become part of the public transcript or record of proceedings[.]" (§ 299.5, subd. (k), italics added.)  The DNA Act thus expressly *authorizes* the use of government stored DNA, including samples containing the entire human genome, not just to "identify" a person in the sense of verifying who he or she is, or to ascertain an accused person's innocence, but also to assist with the "arrest, investigation, prosecution, or exclusion" of a person.  (§ 299.5, subd. (k).)  And because the DNA Act authorizes retention of DNA samples as well as the profiles derived from them, those retained samples, can be used to criminally investigate persons whose DNA was obtained upon arrest many years earlier, even if they were never criminally charged or were acquitted.

Apparently, the only limitation imposed by the Act's references to "identification" is a prohibition against analysis and use of DNA for non-law enforcement purposes relating to matters such as an individual's health, propensity for certain diseases or conduct, gender, or race.  (See *Kincade, supra,* 379 F.3d at pp. 837-838; *id.* at p. 842, fn. 3 (dis. opn. of Gould, J.).)  In other words, DNA is to be collected and analyzed for "identification" purposes in the sense that the only information that is supposed to be drawn from DNA samples is that which identifies the donor.  But this identifying information is not used to "identify" the donor in relation to the arrest; it is used to *investigate* the donor's connection to crime *unrelated* to the crime of arrest.

Indeed, California is already using DNA information collected from convicted offenders for investigatory purposes completely unrelated to any definition of "identification" of the person from whom the DNA was taken.  California was the first state to permit deliberate familial DNA searches, intentionally using DNA profiles to

34

investigate the donor's close relatives as possible perpetrators.[17] Law enforcement agencies are able to identify likely family relationships through "partial matches" of DNA profiles because of the distinctively high number of alleles shared by family members. Since every person inherits one allele at each of the 13 CODIS loci from each of his or her biological parents, everyone shares at least 13 alleles with each parent, and more if both parents happen to possess the same allele at one or more loci. (See Greeley et al., *Family Ties* (2006) 34 J.L. Med. & Ethics 248, 249-252.) It has been estimated that on average, a Caucasian parent and child (a population for which good published data exists) share 15.7 alleles of the 26 profiled in CODIS, and full siblings share an average of 16.7 alleles. (*Id.* at pp. 252-253.) In contrast, unrelated persons share an average of 8.7 alleles. (*Id.* at p. 252.)[18] While a number of states and the federal government permit use of partial matches discovered fortuitously in the course of routine database searches, California is one of the few that allow *deliberate* searches for this purpose. (*Fortuity*, *supra*, 63 Stan. L.Rev. at pp. 753, 764, 767-769.)

---

[17] The FBI's website identifies four states as having "taken the lead" in familial searching: California, Colorado, New York, and Florida. (FBI, Laboratory Services, Familial Searching <http://www.dnaforensics.com/StatesAndFamilialSearches.aspx> [as of Dec. 1, 2014].)

[18] Unlike an "exact match" which indicates that the owner of the profiled DNA was involved in the crime under investigation, a "partial match" "refers to two genetic profiles—one derived from a crime scene sample and the other from CODIS—that share some, but not all, of the thirteen core DNA loci that comprise a CODIS profile. This kind of match generally excludes the offender whose CODIS profile provides the match, because that individual's DNA is demonstrably different from the crime scene sample. A partial match may instead inculpate the offender's close genetic relatives as possible perpetrators of a crime because they, like the crime scene sample, share some but not all of the examined loci with the individual whose CODIS profile provided the partial match. The information derived from a partial match where two nonmatching profiles share rare genetic markers will be particularly suggestive of a relative's involvement in a crime." (Ram, *Fortuity and Forensic Familial Identification* (2011) 63 Stan. L.Rev. 751, 763-764 (*Fortuity*), citing Sjerps & Kloosterman, *On the Consequences of DNA Profile Mismatches for Close Relatives of an Excluded Suspect* (1999) 112 Int'l J. Legal Med. 176, 177.)

California law enforcement agencies have engaged in such deliberate familial searching for many years, though so far only with DNA profiles of convicted offenders (<https://oag.ca.gov/bfs/prop69/faqs>), and the California DOJ has made it clear that this use of non-coding or "junk" DNA relates solely to criminal investigations.  In 2008, the DOJ sent all California law enforcement agencies and district attorneys' offices an "Information Bulletin" stating that it had developed a "DNA Partial Match Reporting and Modified CODIS (Combined DNA Index System) Search Policy that may result in *investigative* information provided to law enforcement officials in unsolved cases where all other *investigative* leads have been exhausted."  (Cal. DOJ, Div. of Law Enforcement, Information Bulletin 2008-BFS-01, *DNA Partial Match (Crime Scene DNA Profile to Offender) Policy* (Bulletin), italics added <http://ag.ca.gov/cms_attachments/press/ pdfs/n1548_08-bfs-01.pdf> [as of Dec. 1, 2014.)  The Bulletin states that "[t]he name of an offender who is not the source of the biological material from an unsolved case may be released in *an investigation*" when a partial match is discovered either fortuitously or as the result of a deliberate search, and sets forth a protocol to be followed and conditions which must be met in order to release the name "to the *investigating agency*" in either situation.  (*Id*. at pp. 1-2, italics added.)[19]  The DOJ has also developed a software

_____

**19**  With respect to a deliberate search, the Bulletin declares that "[w]hen a law enforcement agency is *investigating* an unsolved case that has critical public safety implications, the agency may request that DOJ conduct a modified CODIS search with the objective of identifying any offender(s) in the database who are likely to be related to the unknown perpetrator.  In these situations, the name of an offender may be released to the *investigating agency*" provided that a specified protocol has been followed and its conditions all been met.  (Bulletin, *supra,* at p. 2, italics added.)

For a fortuitous partial discovery, the Bulletin states that "[w]hen a partial match occurs that has at least 15 shared STR alleles with an offender, DOJ will contact the local laboratory's CODIS administrator to confirm that the case is not yet solved.  If the case is still active, *the case investigator* should be notified of the partial match by the local CODIS laboratory and the process defined in the policy will be followed upon request."  (Bulletin, *supra*, at p. 2, italics added.)

The Bulletin provides that "any costs associated with the special DNA testing of the crime scene evidence must be paid for by the *investigative agency,* unless the crime scene evidence testing was performed by DOJ."  (Bulletin, *supra*, at p. 3, italics added.)

program to assist investigators in more effectively identifying familial relationships. (*Fortuity, supra,* 63 Stan. L.Rev. at pp. 753-754 [citing Spriggs, *Familial Search Procedure*, in CAL-DNA Data Bank Technical Procedures Manual, 27, 29, and Steinberger & Sims (2008) *Finding Criminals Through the DNA of Their Relatives – Familial Searching of the California Offender DNA Database*, 31 Prosecutor's Brief 38].)[20]

In sum, the California DNA Act cannot reasonably be characterized as aimed at identification of the donor of a DNA sample. DNA taken at the time of arrest is not intended to be used, and cannot usefully be employed, to verify the arrestee's identity; it is intended to be used and is in fact employed to investigate the arrestees' possible

---

[20] Further reflecting the importance of the investigative purpose of the DNA Act, respondent emphasizes that DNA testing of arrestees "is an important and effective law enforcement tool," asserting that adult felony arrestees are "more likely than not become tomorrow's convicted offenders." The Attorney General's website states that "[c]ollecting forensic identification DNA database samples from offenders at felony arrest, rather than after conviction has more than doubled the crime-solving efficacy of California's database program." (FAQ, *supra,* Effects of the All Adult Arrestee Provision, Ques. 2 <http://oag.ca.gov/bfs/prop69/faqs>.)

This conclusion may be an overstatement. Analyses of DNA profiling and databases, including California's, indicate that " 'hits' and 'investigations aided' metrics are poor indicators of whether DNA databases aided in resolving criminal investigations" because this data does not reveal whether hits resulted in arrests or convictions. (James, Congressional Research Service, *DNA Testing in Criminal Justice: Background, Current Law, Grants, and Issues* (Feb. 25, 2014) at p. 6; RAND Corporation, Center on Quality Policing, Toward a Comparison of DNA Profiling and Databases in the United States and England (2010) (RAND study) at pp. 17, 20.) Further, "[d]atabase matches are more strongly related to the number of crime-scene samples than the number of offender profiles in the database" (RAND study at p. 20), and it has been suggested that, given the constraints of financial resources, the focus on increasing the database of offender profiles comes "at the cost of greater backlogs and fewer technicians for crime scene sample collection and analysis." (*DNA Testing, supra,* 127 Harv. L.Rev. at pp. 182-183.) It has also been suggested that the impact of collecting DNA from arrestees may be small because many have previously been convicted, so already have profiles in the database, and many of the others will have profiles added upon conviction. (Kaye, The Constitutionality of DNA Sampling on Arrest (2001) 10 Cornell J. L. & Pub. Pol'y 455, 502, fn. omitted.)

involvement in criminal conduct unrelated to the crime of arrest and to add to the DNA database for purposes of future crime-solving. Once again, Justice Scalia's words are apt: "The Court's assertion that DNA is being taken, not to solve crimes, but to identify those in the State's custody, taxes the credulity of the credulous." (*King, supra,* 133 S.Ct. at p. 1980 (dis. opn. of Scalia, J.).) Analysis of DNA collected from arrestees does not serve the asserted governmental purpose—identification—and the apparent *actual* purpose for taking DNA samples at this early stage—investigation—cannot be squared with established constitutional principles protecting against suspicionless searches.

## C.

### *Arrestee Searches Under Article I, section 13, of the California Constitution*

As we have said, the scope of permissible searches of arrestees is one of the specific areas in which article I, section 13, has been held to provide greater protection than the Fourth Amendment. (*Brisendine, supra,* 13 Cal.3d 528; *Ruggles, supra,* 39 Cal.3d 1.) In *Brisendine,* which was concerned with a search incident to an arrest for a minor offense that would not involve the defendant being taken into custody (*Brisendine*, at p. 533), the circumstances of the case justified a search of the defendant's person and knapsack for weapons; at issue was a further search of closed containers within the knapsack (an opaque bottle and envelopes). (*Id.* at pp. 540-545.) Two then-recent United States Supreme Court cases, *United States v. Robinson* (1973) 414 U.S. 218 (*Robinson*)—which was relied upon heavily in *King, supra,* 133 S.Ct. at pages 1971, 1974, 1978—and *Gustafson v. Florida* (1973) 414 U.S. 260, had upheld such searches, holding that " 'in the case of a lawful custodial arrest a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment, but is also a "reasonable" search under that Amendment.' " (*Brisendine,* at p. 547, quoting *Robinson,* at p. 235.) Prior California precedent was to the contrary, holding that where a defendant was arrested for an offense that did not have " 'instrumentalities' " or " 'fruits,' " and was to be released either upon citation or on bail rather than booked into jail, only a limited search for weapons was permissible. (*Brisendine,* at pp. 536-537; *People v. Superior Court (Simon)* 7 Cal.3d 186.)

Adhering to its own precedent, the *Brisendine* court explained, "In choosing between these irreconcilable rules we cannot accept the *Robinson* implication that 'an individual lawfully subjected to a custodial arrest retains no significant Fourth Amendment interest in the privacy of his person.' ([*People v. Robinson*, *supra*,] 414 U.S. at p. 237; Powell, J. concurring.) Whatever may be the merit of that view when an individual is ultimately to be booked and incarcerated—a question not presented here— we find it inappropriate in the context of an arrestee who will never be subjected to that process." (*Brisendine, supra,* 13 Cal.3d at p. 547.) Accordingly, *Brisendine* reaffirmed and followed "the decisions, exemplified by *Simon*, which impose a higher standard of reasonableness under article I, section 13, of the California Constitution." (*Id.* at p. 552.) This position was reiterated in *People v. Norman*, *supra*, 14 Cal.3d at pages 938-939, and *People v. Longwill*, *supra*, 14 Cal.3d at page 951. In *People v. Laiwa* (1983) 34 Cal.3d 711, 727 (*Laiwa*), the court reaffirmed that the scope of an arrestee search must be tailored to the particular justifications of the situation. *Laiwa* held that a search of the defendant's tote bag could not be justified as an "accelerated booking search" (on the theory that the search would inevitably occur at booking) because the search at the time of arrest could involve a greater intrusion into the arrestee's privacy than a jailhouse search (for example, a search in a public place), and the justifications for a booking search—inventory of the arrestee's property and jail safety—were not served by a search at the time of arrest. (*Id.* at pp. 725-726.)

These cases particularly emphasized the need to protect against warrantless exploratory searches for evidence unrelated to the crime of arrest. In *Brisendine,* the court observed that an ostensible search for weapons that was "merely a façade designed to provide justification for an exploratory search for narcotics . . . would have been illegal." (*Brisendine*, *supra*, 13 Cal.3d at pp. 534-535.) *Laiwa* discussed the fact that if an "accelerated booking search" exception to the warrant requirement were recognized, "police officers would have a license to conduct an immediate 'thorough search of the booking type' of the person and effects of any individual they arrest without a warrant for a minor but bookable offense, in the hope of discovering evidence of a more serious

crime; if such evidence were found, the suspect would then be booked instead on the latter charge and the intrusion would be rationalized after the fact as an 'accelerated booking search.' " (*Laiwa, supra,* 34 Cal.3d at p. 727-728.)[21]

Respondent argues that *Brisendine* does not support any limitation on searches conducted when an arrestee is booked for a felony arrest, viewing the case as invoking the California Constitution only to enforce a statutory scheme that restricted the procedures police could employ after minor offenses for which an individual could avoid the booking process. It is true that *Brisendine* did not involve a felony arrest, but the point of the court's discussion of these restrictions was that whether and to what extent a search is justified depends upon the circumstances of the encounter. Classification based on whether the individual would be cited, transported to a magistrate, or booked into jail was "essential to analysis, since both the justification and the scope of a weapons search incident to an arrest are dependent on the relative danger to the officer presented by each type." (*Brisendine, supra,* 13 Cal.3d at p. 536.)

*Brisendine* did not address the scope of booking searches—as the opinion expressly stated. (*Brisendine*, *supra*, 13 Cal.3d at p. 547.) The only point we draw from *Brisendine* is that the substantive scope of article I, section 13, is not limited by the United States Supreme Court's interpretation of the Fourth Amendment, and may in compelling circumstances afford greater protection of an arrestee's privacy interests. There is no reason to restrict this principle to cases involving minor offenses, as respondent does in arguing that the scope of a felony arrest and booking search in California is governed by *Robinson*. Indeed, the California Supreme Court has recognized the "more exacting standard" of article I, section 13, in a case involving a felony arrest. (*Ruggles, supra,* 39 Cal.3d at pp. 11-12.) In holding that probable cause to

---

[21] In *People v. Smith* (1986) 103 Cal.App.3d 840, 845-846, cited with approval in *Laiwa, supra,* 34 Cal.3d at page 727, the court noted that "[t]o declare that arrestees have no further privacy interest in their personal property once it is subjected to a booking search would mean that all accused persons, whether subsequently found innocent or guilty, would be subject to having their effects rummaged through at will during the entire period of their incarceration. This is a result we cannot condone."

search the defendant's vehicle, including the trunk, did not justify the warrantless search of a briefcase and tote bags in the trunk, the *Ruggles* court relied in significant measure on the fact that "[e]ach day millions of Californians drive in automobiles, often taking with them, inside briefcases or other similar luggage, items of a highly personal or confidential nature. Permitting such containers to be searched on the basis of probable cause alone deprives the owner of the added protections of a warrant." (*Id.* at pp. 12-13.) The human genome—an expansive (and expanding) trove of the most personal and confidential information a person can possess—is in need of at least as much protection against governmental intrusion as those containers.

Respondent's assertion that the scope of a booking search in California is governed by *Robinson*, *supra,* 414 U.S. 218, also appears to be based on the assumption that Proposition 8, which was adopted in 1982, requires us to follow federal precedent. It is critical, however, to distinguish the substantive scope of constitutional protection against warrantless searches and seizures from the *remedy* for violations of that protection. Since the adoption of Proposition 8, evidence cannot be excluded as violative of state protections against unreasonable search and seizure unless it would also be inadmissible under the Fourth Amendment. (*In re Lance W.* (1985) 37 Cal.3d 873, 888 (*Lance W.*).)[22] But Proposition 8 did not alter the "substantive scope" of California's constitutional provision. (*Lance W.,* at p. 886.) "What would have been an unlawful search or seizure in this state before the passage of [Proposition 8] would be unlawful today, and this is so even if it would pass muster under the federal Constitution." (*Lance W.,* at p. 886.)

Respondent's reliance upon *People v. Diaz* (2011) 51 Cal.4th 84, 90-95, is misplaced. *Diaz*, affirming the denial of a suppression motion, upheld a search of text

---

[22] Proposition 8 added article I, section 28, subdivision (d), to the California Constitution, stating that " '[e]xcept as provided by statute hereafter enacted by a two thirds vote of the membership in each house of the Legislature, relevant evidence shall not be excluded in any criminal proceeding . . . .' " (*Lance W., supra,* 37 Cal.3d at p. 879.)

41

messages on a cell phone found on defendant's person at time of arrest on the basis of *Robinson* and other United States Supreme Court precedent concerning the extent of a permissible search incident to arrest. (*Diaz,* at pp. 90-95.) Because it presented a question concerning suppression of evidence, the case was required to be decided solely under the Fourth Amendment, in accordance with "the United States Supreme Court's binding precedent." (*Diaz,* at pp. 88, 101.) The *Diaz* court, therefore, had no basis for inquiring whether the substantive scope of a permissible search should be viewed differently under the California Constitution—as the court did when it rejected *Robinson* in *Brisendine*. And even as to the suppression issue, *Diaz* has now been effectively overruled by the United States Supreme Court's conclusion that the search incident to arrest exception to the warrant requirement does *not* apply to digital data on a cell phone in an arrestee's possession. (*Riley v. California*, *supra*, ___ U.S. ___ [134 S.Ct. at pp. 2493-2494].) The *Riley* court rested its decision on the absence of any connection between search of the digital data and officer safety or destruction of evidence, the concerns underlying the exception, and the far greater privacy interests implicated in this sort of search than in prior search incident to arrest cases. (*Id.* at pp. 2485-2491.)

*People* v. *Miranda* (1987) 44 Cal.3d 57, the other case cited by respondent concerning booking searches, held that a letter in an envelope in the defendant's pocket "during an inventory booking search" at the police station was admissible at trial. (*Id*. at pp. 81-82.) Citing *Laiwa, supra,* 34 Cal.3d at page 726, and *Illinois v. Lafayette*, *supra*, 462 U.S. at page 646, *Miranda* explained that "the purposes of and justifications for [a search of the personal effects of an arrested person at the time of booking] are essentially two—to safeguard and account for the arrestee's belongings and to promote jail security." (*Miranda,* at p. 81.) A search can be justified on this basis only if these purposes are met; neither a search before actual booking nor one conducted after the booking process has ended meet the test. (*Laiwa,* at p. 727; *People v. Smith*, *supra*, 103 Cal.App.3d at p. 845.) Respondent does not explain how the taking of a DNA sample at booking, before a judicial determination of probable cause, would be justified as an inventory search or promote jail security.

Contrary to respondent's assertion, the California Supreme Court has never held that in the area of search and seizure, the rights guaranteed by the state and federal Constitutions are necessarily "coextensive." As respondent points out, the court has held that "the touchstone for all issues under the Fourth Amendment and article I, section 13 of the California Constitution is reasonableness" (*Ingersoll v. Palmer* (1987) 43 Cal.3d 1321, 1329) and that the federal and state Constitutions "extend similar protection against 'unreasonable searches and seizures.' " (*Lance W., supra,* 37 Cal.3d at p. 881.) But the fact that both provisions are analyzed through the prism of similar factors does not mandate the same outcome in all cases—as *Brisendine* and the other cases discussed above make clear. And, as we have said, *Lance W.* itself noted that the *substantive* scope of article I, section 13 was not affected by Proposition 8's requirement that California courts admit evidence that would not be excluded under the Fourth Amendment. (*Lance W.,* at p. 886.)

*People v. Crowson* (1983) 33 Cal.3d 623, 629 (*Crowson*), overruled on other grounds in *People v. Myers* (1993) 5 Cal.4th 1193, 1195, is not to the contrary. In that case, the police had secretly recorded a conversation between the defendant and an accomplice while the two were alone in the back seat of a police car. The defendant challenged admission of the recording on the ground that the secret recording violated his right to privacy under article I, section 1, of the California Constitution. (*Crowson,* at pp. 625, 628-629.) Rejecting this claim, *Crowson* stated, "In the search and seizure context, the article I, section 1 'privacy' clause has never been held to establish a broader protection than that provided by the Fourth Amendment of the United States Constitution or article I, section 13 of the California Constitution. '[The] search and seizure and privacy protections [are] coextensive when applied to police surveillance in the criminal context.' (*People v. Owens* (1980) 112 Cal.App.3d 441, 448-449.)" (*Crowson,* at p. 629.) Under all three provisions, *Crowson* stated, the question was whether the defendant had a reasonable expectation of privacy in the conversation with his accomplice in the backseat of the police car. (*Id.* at p. 629.)

43

*Crowson* engaged in no analysis of the substance of the state and federal search and seizure provisions *as compared to each other*; it simply compared those two provisions, on the one hand, with the state privacy provision, on the other. Its observation that the privacy provision does not afford greater protection in the search and seizure context than would the search and seizure provisions themselves says nothing about the respective reach of either search and seizure provision in a given situation. The same is true of the two cases respondent offers as having cited *Crowson* with approval, *Sheehan v San Francisco 49ers, Ltd.* (2009) 45 Cal.4th 992 and *Hill v. National Collegiate Athletic Assn.* (1994) 7 Cal.4th 1. Both *Sheehan* and *Hill* were civil cases in which the plaintiffs claimed violations of their constitutional right to privacy. Both noted the comparison of the two search and seizure provisions with the privacy provision; neither compared the federal and state search and seizure provisions with each other.

Indeed, it would be surprising to find California cases decided after Proposition 8 discussing differences in the substantive scope of the state and federal search and seizure provisions, as it is highly unusual for search and seizure issues to arise in any context other than a suppression motion, which Proposition 8 requires to be decided according to federal law. The unavailability of the exclusionary rule as a remedy for violations of the state Constitution that are not violations of the Fourth Amendment means that state courts considering suppression of evidence must engage in a Fourth Amendment analysis. (*People v. Maikhio* (2011) 51 Cal.4th 1074, 1089.) But the argument respondent draws from this fact—that although the substantive scope of article I, section 13, was unaffected by Proposition 8, arrestees' rights are nevertheless "limited in a practical sense" by the absence of the exclusionary rule as a remedy—is too facile. The present case has nothing to do with the exclusionary rule: The question here is not whether an illegal search and seizure requires suppression of evidence at trial but whether the state can criminalize the refusal to comply with a search that would violate the state's proscription against unreasonable searches. We are free to determine this issue on the basis of California precedent.

## D.

### *Intrusiveness of the California DNA Act*

The California DNA Act intrudes too quickly and too deeply into the privacy interests of arrestees.

As we will explain, the fact that DNA is collected and analyzed immediately after arrest means that some of the arrestees subjected to collection will never be charged, much less convicted, of any crime—and, therefore, that the governmental interest in DNA collection is inapplicable while the privacy interest is effectively that of an ordinary citizen. The absence of automatic expungement procedures increases the privacy intrusion because DNA profiles and samples are likely to remain available to the government for some period of time after the justification for their collection has disappeared, potentially indefinitely. And the fact that familial DNA searches are not prohibited means that the Act would permit intrusion into the privacy interests of arrestees biological relatives if the DOJ were to alter its current policy of not using arrestees' DNA for such searches.

Because the constitutionality of collecting DNA from convicted offenders has been accepted, the governmental interest at stake in *King* was not in obtaining DNA *at all* but in obtaining DNA sooner than if it had to wait for conviction. The Vermont Supreme Court questioned the significance of this interest: As to the difference between obtaining DNA after arraignment and waiting for *conviction,* the court stated, "the State has not shown why quicker access to the DNA is a weighty interest, and we cannot find it to be so." (*Medina, supra,* 2014 Vt. LEXIS 71 at p. *49.)[23]

---

[23] The Vermont court had previously established that the primary purpose of that state's DNA law was to create a database to which DNA evidence from future crime scenes could be compared, *not* to investigate the donor for crimes already committed. (*Medina, supra,* 2014 Vt. LEXIS 71, at pp. *19-*20 ) Regarding the additional considerations of "accurate identification of persons who are subject to conditions of release, or those who are incarcerated pretrial"—the concerns at issue in *King*—the court said, "the need for more accurate identification [than that provided by photographs and fingerprints] is rare and apparently has not arisen among the large numbers of defendants joined in this case." (*Medina*, at pp. *32, *48-49)

Justice Scalia pointed out in his *King* dissent that the majority's decision had an "ironic result": "The only arrestees to whom the outcome here will ever make a difference are those who *have been acquitted* of the crime of arrest (so that their DNA could not have been taken upon conviction). In other words, [the Maryland law] manages to burden uniquely the sole group for whom the Fourth Amendment's protections ought to be most jealously guarded: people who are innocent of the State's accusations." (*King, supra,* 133 S.Ct. at p. 1989 (dis. opn. of Scalia, J.).)

In California, the burdened group includes not only those ultimately acquitted of criminal conduct but also those never even charged. The percentage of arrestees potentially affected in the latter way is not small: Statistics published by the DOJ indicate that in 2012 (the most recent year for which these numbers are available), 62 percent of felony arrestees who were not ultimately convicted—almost 20 percent of total felony arrestees—were never even charged with a crime.[24] (*Crime in California 2012*, *supra*, at p. 50 <http://oag.ca.gov/sites/all/files/agweb/pdfs/cjsc/publications/candd/cd12/cd12.pdf?>.) The governmental interests found in *King* to justify DNA testing do not apply to this group of arrestees, who will neither be held for a prolonged period in pretrial custody nor released under court supervision. Absent exceptional circumstances, an arrestee who is in custody must be brought before a magistrate for a determination of probable cause to arrest within 48 hours. (*County of Riverside v. McLaughlin* (1991) 500 U.S. 44, 56-57; § 825, subd. (a)(1).)[25] This defines the outer limit of the time an arrestee

---

[24] For 2012, of the 93,052 arrestees who were not convicted, 57,601 were not charged. (California Department of Justice, Division of California Justice Information Services, Bureau of Criminal Information and Analysis, Criminal Justice Statistics Center, *Crime in California 2012*, at p. 50 (*Crime in California 2012*) <http://oag.ca.gov/sites/all/files/agweb/pdfs/cjsc/publications/candd/cd12/cd12.pdf?>].)

[25] Under *County of Riverside v. McLaughlin, supra,* 500 U.S. at page 57, where an arrestee does not receive a probable cause determination within 48 hours, the government must demonstrate "the existence of a bona fide emergency or other extraordinary circumstance."

who is *not* ultimately charged may be held in custody.  As we have seen, the processing of a DNA sample to develop a profile currently takes considerably longer than this.  (*King, supra,* 133 S.Ct. at p. 1973; see pp 29-30 and fn. 8, *ante* [AG monthly statistics for DNA lab on processing time].)  As a practical matter, DNA collected from individuals who are arrested but not charged cannot be used either to verify the identity of the arrestee or to serve the interests discussed in *King.*  The only possible use law enforcement agencies can make of these arrestees' DNA is in investigation of other crimes.

In the present case, respondent's only articulation of its interest in *immediate* DNA testing—as opposed to testing *after* a judicial determination of probable cause—is that the sooner the testing is accomplished, the lower the risk of a dangerous individual remaining unidentified.  The weight of this time-limited interest is extremely low.  At the same time, the privacy interest of the arrestee is considerably higher.  Arrestees, while suspected of having committed a crime, still enjoy the presumption of innocence and therefore occupy a different place in constitutional analysis than convicted offenders, who by virtue of their convictions suffer a loss of certain constitutional rights.  (See *Friedman v. Boucher* (9th 2009) 580 F.3d 847, 856-858; *Medina, supra,* 2014 Vt. LEXIS 71 at p. *51.)  An arrestee whose arrest has not even been subjected to a judicial determination of probable cause falls closest on the spectrum of privacy rights to an ordinary citizen.[26]

---

Section 825, subdivision (a)(1), requires that an arrestee "be taken before the magistrate without unnecessary delay, and, in any event, within 48 hours after his or her arrest, excluding Sundays and holidays."

[26] Respondent has attempted to downplay the absence of a judicial determination of probable cause, arguing that "loss of freedom of choice and privacy are 'inherent incidents' of felony arrest," and the " 'presumption of innocence' does not entitle arrestees to claim the full protection of Fourth Amendment privacy guarantees available to ordinary citizens."  Appellant, however, has explicitly acknowledged that arrestees' privacy expectations are "less than members of the general public."  He argues only that his privacy rights are greater than those of prisoners, parolees and probationers.

Moreover, permitting DNA to be collected immediately after arrest effectively leaves the determination of who will be subjected to DNA testing entirely in the hands of arresting officers. In many situations, the conduct for which an individual is arrested might be viewed as fitting the definition of a number of different crimes; whether the offending behavior is charged as a misdemeanor or a felony is initially left to the judgment of the arresting officers, leaving room for variation between both jurisdictions and between individual officers. (See *DNA Testing, supra,* 127 Harv. L.Rev. at pp. 188-189.) As the Supreme Court has explained with respect to the federal Constitution, " 'The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime.' " (*Gerstein v. Pugh* (1975) 420 U.S. 103, 112-113, quoting *Johnson v. United States* (1948) 333 U.S. 10, 13-14.) Under the DNA Act, however, processing can begin when the legal basis for arrest is only the arresting officer's determination of probable cause, and the sample and resulting profile will be retained unless and until the arrestee succeeds in the onerous and perhaps quixotic process of having them expunged—even if the arrest is subsequently determined by a judicial officer to have been without sufficient cause. This means there is no check on the discretion of the officers who make the arrests that create the

---

Respondent also relies upon the statement in *In re York* (1995) 9 Cal.4th 1133, that the " 'presumption of innocence is a doctrine that allocates the burden of proof in criminal trials; . . . *it has no application to a determination of the rights of a pretrial detainee during confinement before his trial has even begun.*' " (*Id.* at p. 1148, quoting *Bell v. Wolfish*, *supra*, 441 U.S. at p. 533.) The salient point in *York* was that a lawful arrest allows restrictions on the liberty to which a citizen is ordinarily entitled. But the mere fact of an arrest does not render it lawful, a judgment that can be made only after a judicial determination of probable cause. At the time appellant was asked for and refused to provide a DNA sample, no judicial officer had determined whether there was probable cause to believe he had committed a crime.

opportunity for DNA sampling until after the sample may have been used for investigative purposes.

Further, aside from the undue discretion afforded to law enforcement officers to determine whether an arrestee will be subject to DNA testing, this aspect of the DNA Act opens an opportunity for actual abuse. Without questioning the integrity of most law enforcement officers, it is not difficult to think that the DNA Act might provide an incentive to pretextually arrest a person from whom the police desire a DNA sample, as the Act would permit officers to collect the DNA and then release the uncharged arrestee, thereby obviating the need for any judicial inquiry into probable cause. (See *Laiwa, supra,* 34 Cal.3d at pp. 727-729 [accelerated booking search would give police license to conduct booking search on arrest for minor offense in hope of discovering evidence of more serious crime]; *Brisendine, supra,* 13 Cal.3d at p. 534 [ostensible weapons search as façade to justify exploratory search for narcotics would be illegal].)[27]

The fact that the DNA Act does not provide for automatic expungement increases the weight of the arrestee's privacy interest. California places the burden on the arrestee to pursue an onerous judicial process which seemingly vests the prosecutor with power to prevent expungement merely by objecting to the request (§ 299, subd. (c)(2)(D)); gives the trial court discretion to deny expungement without specifying any parameters for the

---

[27] The *King* majority indicated that one of the reasons no warrant was needed for an arrestee DNA search was that the Maryland law made collection of DNA from specified arrestees mandatory: "The DNA collection is not subject to the judgment of officers whose perspective might be 'colored by their primary involvement in "the often competitive enterprise of ferreting out crime." ' *Terry* [v. *Ohio* (1968) 392 U.S. 1,] 12, quoting *Johnson v. United States*[, *supra*,] 333 U.S. [at p.] 14. As noted by this Court in a different but still instructive context involving blood testing, '[b]oth the circumstances justifying toxicological testing and the permissible limits of such intrusions are defined narrowly and specifically in the regulations that authorize them. . . . Indeed, in light of the standardized nature of the tests and the minimal discretion vested in those charged with administering the program, there are virtually no facts for a neutral magistrate to evaluate.' *Skinner*, *supra*, [489 U.S. at p. 622]." (*King, supra,* 133 S.Ct. at p. 1970.) Under the Maryland law, however, DNA is not analyzed until after a judicial determination of probable cause. The *King* majority's point, that the absence of discretion protects against abuse, cannot be made about the DNA Act.

exercise of that discretion; and renders the trial order unreviewable by appeal or writ. The element of discretion—and, therefore, uncertainty—in these procedures raises a question whether they satisfy the requirement of federal law for states with access to CODIS to "promptly" expunge DNA information upon receipt of specified documentation that an arrestee's charge did not result in conviction.[28]  In any event, according to a study funded by the National Institute of Justice (NIJ), in states where the responsibility for initiating the expungement process is placed upon the arrestee, "[i]nterviews with crime lab officials show that very few people initiate the process, so their profiles remain in the databases."  (DNA Sample Collection from Arrestees, NIJ (Dec. 12, 2012) <http://www.nij.gov/topics/forensics/evidence/dna/pages/collection-from-arrestees.aspx>.)[29]  Thus, in California, the government may retain indefinitely the

---

[28]  Under the federal DNA law, "the FBI expunges from the national DNA index the DNA information of a person included in the index on the basis of conviction for a qualifying federal offense if the FBI receives a certified copy of a final court order establishing that the conviction has been overturned" and "expunges the DNA information of a person included in the index on the basis of an arrest under federal authority if it receives a certified copy of a final court order establishing that the charge has been dismissed or has resulted in an acquittal or that no charge was filed within the applicable time period."  (73 Fed. Reg. 74932; 42 U.S.C. § 14132, subd. (d)(1)(A).)

Federal law requires each state, "[a]s a condition of access to the [DNA] index," to "promptly expunge from that index the DNA analysis of a person included in the index by that State if [¶] . . . the responsible agency or official of that State receives" the above described documentation that the relevant conviction has been overturned, or charge has been dismissed, resulted in acquittal, or was not filed within the applicable time period. (42 U.S.C. § 14132, subd. (d)(2)(A).)  While California is required to adhere to the federal standards in order to maintain access to CODIS (42 U.S.C. § 14132, subd. (d)(2)(A)), it is unclear whether and how this requirement is enforced.

[29]  As described on its website, the NIJ, "the research, development and evaluation agency of the United States Department of Justice," "funded the Urban Institute to examine how key provisions in arrestee DNA legislation influence the logistical activities associated with DNA collection and analysis.  The study involves a review of state and federal laws along with interviews of state crime laboratory representatives in 26 of the 28 states that passed legislation authorizing collection of DNA from some subset of arrestees.  Although the study is ongoing, the Urban Institute provided some preliminary

50

DNA of individuals who have not been convicted of or even charged with a qualifying offense.[30]

In addition, due to California's policy of familial searching, the California DNA Act intrudes upon the privacy of individuals who have not themselves come into any contact with law enforcement.  This intrusion is worthy of discussion despite California's present policy of using only convicted offenders' DNA for familial searches (FAQ, *supra,* California's Familial Search Policy <http://oag.ca.gov/bfs/prop69/faqs>; Bulletin, *supra*, <http://ag.ca.gov/cms_attachments/press/pdfs/n1548_08-bfs-01.pdf>) because the limitation to convicted offenders' DNA is solely a matter of policy:  Nothing in the DNA Act imposes this restriction.  If collection of DNA from arrestees is upheld, it is difficult to imagine familial searches will continue to be limited to convicted offenders.  The history of DNA testing in the criminal justice system has been one of steady expansion— from initial testing only of offenders convicted of specified serious crimes of violence, to testing of all felons, and now to testing of arrestees.  In evaluating the degree to which the procedure intrudes upon Californians' privacy rights, we cannot close our eyes to the obvious implications of upholding each further encroachment.

Aside from their targeting of individuals who have done nothing to bring themselves into contact with the criminal justice system,[31] familial DNA searches have a

---

findings that are current as of June 2012."  (<http://www.nij.gov/topics/forensics/ evidence/dna/pages/collection-from-arrestees.aspx>)

[30]  Under the Maryland law, by contrast, because DNA samples are not analyzed until after arraignment and are automatically expunged if the donor is not convicted, the DNA information of an arrestee who is not charged with a qualifying crime will never be at the government's disposal; the DNA of an arrestee who is charged but not convicted will at most be in the government's hands only during the period between arraignment and conclusion of the case.  (See *Medina, supra,* 2014 Vt. LEXIS 71, at p. *49.)

[31]  As one commentator has noted, even if persons whose DNA profiles are in the California CODIS database have forfeited their privacy rights, "they surely cannot have relinquished the interests of their father, mother, brothers, sisters, and children.  Familial searches exploit the government's power to compel information from persons with diminished privacy (*i.e*., mandatory typing of the offender's DNA profile) to then invade the privacy of their law-abiding relatives (by drawing inferences about the relatives'

51

discriminatory effect:  These searches condition criminal suspicion on nothing more than the fact of being a close relative of a person whose profile is in the DNA database, and racial and ethnic minorities comprise a much greater portion of that database than their proportion in the population at large.  (Kaye & Smith, *DNA Databases: Legality, Legitimacy, and the Case for Population-Wide Coverage* (2003) 2003 Wisc. L.Rev. 413, 440-441 (*DNA Databases*); *Relative Doubt, supra,* 109 Mich. L.Rev. at p. 322; Duster, *DNA Dragnets and Race: Larger Social Context, History, and Future* (Nov.-Dec. 2008) 21 GeneWatch 3, 3-4.)[32]

The combined effect of the foregoing features of the DNA Act, with respect to arrestees, is certain to infringe the privacy of thousands of persons who were never convicted or even charged with the offense for which they were arrested.  And the DNA Act would permit the infringement of arrestees' relatives' privacy as well, if the DOJ saw fit to alter its current policy on familial DNA searches. [33]

---

profile).  Familial searching effectively amounts to a law that says, 'The identity and probable genetic markers of the close relatives of any convicted offender [or arrestee] shall be entered in the national database.' "  (Murphy, *Relative Doubt: Familial Searches of DNA Databases* (2010) 109 Mich. L.Rev. 291, 317 (*Relative Doubt*).)

[32]  A study of the impact of California familial search policy concluded that "the reliance on racially disproportionate databases will on average impact the targeting of suspicion, drawing disproportionate attention toward Hispanics and African-Americans and against Asian Americans, and weakly affecting Caucasians."  (*Relative Doubt, supra*, 109 Mich. L.Rev. at p. 323.)  Moreover, "even if searches never generated any actual discrimination, the mere reliance on offender databases raises an appearance of bias that the criminal justice system can little tolerate.  Criticism of the system and its inequities has already deeply divided communities and undermined trust in and cooperation with law enforcement actors.  Using offender databases to find relatives sends a message that in cases in which there is no evidence of the perpetrator's identity or ethnicity, it is fair to focus suspicion on not just the usual suspects, but also the innocent relatives of the usual suspects."  (*Ibid*., see also, Duster, *Selective Arrests, an Ever-Expanding DNA Forensic Database, and the Specter of an Early-Twenty-First-Century Equivalent of Phrenology*, in Lazer (ed.) *The Technology of Justice: DNA and the Criminal Justice System* (2004).)

[33]  Such a change in policy would also exacerbate the discriminatory effect of familial searching since, in California, far more members of racial and ethnic minorities are arrested for felonies than are people who are not minorities.  (*Crime in California 2012*, *supra*, at p. 33 <http://oag.ca.gov/sites/all/files/agweb/pdfs/cjsc/publications/

*Reasonable Expectation of Privacy*

Article I, section 1, of the California Constitution provides, "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy." The words "and privacy" were added to this provision by an initiative adopted in 1972 (the Privacy Initiative). (*Hill, supra,* 7 Cal.4th at p. 15.) The United States Constitution contains no comparable express protection of privacy rights.

Article I, section 1, of the California Constitution adds an additional factor that must be considered in balancing the governmental interest and private expectation of privacy regarding DNA testing. This case, as we have said, does not involve a claim of invasion of privacy in violation of article I, section 1, and, in any event, such a privacy claim in the search and seizure context would not offer more protection than a claim under article I, section 13. (*Crowson, supra,* 33 Cal.3d at p. 629.) But the "reasonable expectation of privacy" protected by the Fourth Amendment, article I, section 13, or article I, section 1, is measured by an objective standard: the expectation of privacy *society* would recognize as reasonable. In the context of a search and seizure claim, " 'a defendant must demonstrate that he [or she] personally has an expectation of privacy in the place searched, and that his expectation is reasonable; *i.e.,* one that has "a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society." ' " (*People v. Ayala* (2000) 23 Cal.4th 225, 255, quoting *Minnesota v. Carter* (1998) 525 U.S. 83, 88.) For purposes of the privacy clause, "[a] 'reasonable' expectation of privacy is an objective entitlement founded on broadly based and widely accepted community norms. (See, e.g., Rest.2d Torts, *supra*, § 652D, com. c ['The protection afforded to the

---

candd/cd12/cd12.pdf?>.) In 2012, of the total 429,807 felony arrestees in California, 149,044 were Caucasian, while 280,763 were Hispanic, African-American or "other." (*Ibid.*)

plaintiff's interest in his privacy must be relative to the customs of the time and place, to the occupation of the plaintiff and to the habits of his neighbors and fellow citizens.']" (*Hill, supra,* 7 Cal.4th at p. 37.)

It follows from these principles that the express protection for the right to privacy enshrined in the California Constitution cannot be ignored in considering what *California* society would consider a legitimate expectation of privacy. The values reflected in the state constitutional right to privacy necessarily inform and illuminate the scope of this aspect of a claim under article I, section 13—the reasonable expectation of privacy of a California arrestee.

The Privacy Initiative protects both "interests in precluding the dissemination or misuse of sensitive and confidential information ('informational privacy')" and "interests in making intimate personal decisions or conducting personal activities without observation, intrusion, or interference ('autonomy privacy')." (*Hill, supra,* 7 Cal.4th at p. 35.) But "[i]nformational privacy is the core value furthered by the Privacy Initiative. (*White v. Davis* [(1975)] 13 Cal.3d 757, 774.)" (*Hill,* at p. 35.) As the *Hill* court discussed, "[t]he principal focus of the Privacy Initiative is readily discernible. The Ballot Argument warns of unnecessary information gathering, use, and dissemination by public and private entities—images of 'government snooping,' computer stored and generated 'dossiers' and ' "cradle-to-grave" profiles on every American' dominate the framers' appeal to the voters. ([Ballot Pamp., Proposed Stats. and Amends. to Cal. Const. with arguments to voters, Gen. Elec. (Nov. 7, 1972) p. 26 (hereafter Ballot Argument)] at p. 26.) The evil addressed is government and business conduct in 'collecting and stockpiling unnecessary information . . . and misusing information gathered for one purpose in order to serve other purposes or to embarrass . . . .' (*Id.* at p. 27.) 'The [Privacy Initiative's] primary purpose is to afford individuals some measure of protection against this most modern threat to personal privacy.' (*White*[, at p.] 774.)" (*Hill*, *supra*, 7 Cal.4th at p. 21.)

"A particular class of information is private when well-established social norms recognize the need to maximize individual control over its dissemination and use to

prevent unjustified embarrassment or indignity.  Such norms create a threshold reasonable expectation of privacy in the data at issue.  As the ballot argument observes, the California constitutional right of privacy 'prevents government and business interests from [1] collecting and stockpiling unnecessary information about us and from [2] misusing information gathered for one purpose in order to serve other purposes or to embarrass us.'  (Ballot Argument, *supra*, at p. 27.)"  (*Hill, supra,* 7 Cal.4th at pp. 35-36.)

As we have seen, DNA samples contain an enormous amount of personal information—the entire human genome.  DNA testing is neither necessary nor practical for the only non-investigative purpose advanced to justify it—verifying the identity of arrestees.  Moreover, DNA ostensibly gathered for the purpose of identification is misused to serve another purpose, criminal investigation.  Considering also that the DNA Act permits the indefinite retention of this material—even that of arrestees who are never charged or never convicted of any offense—the collection and indefinite storage of DNA samples is the epitome of the kind of stockpiling of personal and private information the Privacy Initiative meant to protect from unnecessary governmental intrusion.  While *King* paid little if any attention to the length of time a DNA sample could be retained and the extent of the uses to which it could be put, including risks of unauthorized leaks or research, as well as human error in the processing and analyzing of DNA (*DNA Testing, supra,* 127 Harv. L.Rev. at pp. 192, 195), such concerns cannot be ignored under article I, section 13, as informed by the values reflected in article I, section 1, of our state Constitution—especially when informational privacy, the "core value" the Privacy Initiative was intended to protect, is at stake.

The DNA Act attempts to address privacy concerns in two ways:  First, by providing for expungement of DNA profiles from the database and destruction of DNA samples when the basis for including them has been proven unwarranted; and, second, by insisting upon confidentiality of "[a]ll DNA and forensic identification profiles and other identification information retained by the [DOJ] pursuant to this chapter" except as provided under the Act (§ 299.5, subd. (a)) and providing for criminal fines and terms of imprisonment for knowing use, or disclosure to an unauthorized individual or agency, of

a DNA sample or profile "for other than criminal identification or exclusion purposes" or "identification of missing persons" (§ 299.5, subd. (i)(1)(A)).

These provisions, of course, do little to protect the privacy interests implicated by the investigatory use of DNA information, as described above. It is questionable how much protection they afford against other misuse of the information. As we have already described, the expungement procedures in the DNA Act put the burden of seeking expungement upon the arrestee, the process is onerous, and the DNA Act appears to allow the prosecutor—whose office has an obvious interest in as many DNA profiles and samples as possible for investigatory use—to block expungement simply by objecting; and the court has unreviewable and therefore unfettered discretion whether to order expungement. The DNA Act does not require the destruction of DNA samples after a specified period of time. To the contrary, section 299, subdivision (e), of the Act specifically declares that DOJ "is not required to expunge DNA profile or forensic identification information or destroy or return specimens, samples or print impressions taken pursuant to this section if the duty to register under Section 290 [the Sex Offender Rights Act] or 457.1 [requiring registration of persons convicted of arson] is terminated." The DOJ is simply "authorized" to dispose of unused specimens and samples or unused portions thereof, "in the normal course of business and in a reasonable manner as long as the disposal method is designed to protect the identity and origin of specimens and samples from disclosure to third persons who are not a part of law enforcement." (§ 299.7.)

As for the enforcement provisions, although the DNA Act criminalizes misuse of DNA information, it is difficult to imagine these provisions being enforced in any but the most exceptional cases. There is no civil remedy for misuse of DNA information (§ 299.5, subd. (i)(2)(B)); the DNA Act requires the government, whose interest is in collecting, analyzing, retaining and using DNA samples, to police itself. Most arrestees will never know if their DNA information has been misused, and even if they do, few are likely to be aware of the existence of criminal penalties and in a position to pursue them. And if an arrestee were able to get this far, the likelihood of a prosecutor pursuing

criminal charges in the average case is not great, given the governmental interest in crime-solving.

In light of the concerns underlying the Privacy Initiative, the nature and extent of personal information contained in DNA samples, and the likely indefinite retention of such samples for many individuals who are never found to have committed a crime, the privacy interest at stake in this case is extremely weighty.

### IV.

### *Conclusion*

The question this case presents, which is increasingly presented to the courts of this state and nation, is the extent to which technology can be permitted to "shrink the realm of guaranteed privacy." (*Kyllo v. United States* (2001) 533 U.S. 27, 34.)  The information contained in a DNA profile—and even more so that in a DNA sample—is deeply personal; "[o]ne can think of few subject areas more personal and more likely to implicate privacy interests than that of one's health or genetic make-up." (*Norman-Bloodsaw v. Lawrence Berkeley Lab.* (9th Cir. 1998) 135 F.3d 1260, 1269.)  The DNA Act permits the specimens seized by the police without a warrant to be retained by the DOJ indefinitely.  The profiles derived from these DNA samples are passed on to the FBI for placement in CODIS and, like the samples themselves, may be disclosed to and used by criminal law enforcement officers and agencies to solve crimes other than those for which a person was arrested and to implicate biological relatives of the person from whom a sample is taken as criminal suspects.

On the continuum of privacy rights ranging from ordinary citizens, with full expectation of privacy, to incarcerated prisoners, with a very limited expectation of privacy (see *Samson, supra,* 547 U.S. at p. 850), the privacy rights of arrestees are greater than those of probationers, parolees or convicted prisoners.  Within the category of arrestees, an individual such as appellant, who has not yet been the subject of a judicial determination of probable cause, falls closer to the ordinary citizen end of the continuum than one as to whom probable cause has been found by a judicial officer or grand jury. And a significant percentage of all felony arrestees—one-third to one-half in 2012—are

57

not in fact convicted;[34] whatever the basis of the initial arrest, many of these arrestees are legally innocent of any crime. Yet their DNA profiles remain in the state and federal databanks, and their DNA specimens and samples in the DOJ Laboratory indefinitely, unless and until they are able to successfully negotiate a lengthy and burdensome expungement process that is far from guaranteed to succeed.

Against this intrusion into individual privacy rights, the governmental interest in DNA testing at this early juncture in the criminal process is problematic. The asserted interest in identification is undermined by the fact that, unlike fingerprints, DNA cannot be processed quickly and used to immediately verify who an arrestee is. The investigative use of DNA testing at this stage, however, strains constitutional limitations. And DNA testing as early as California permits—before arraignment—appears to be of incremental utility at best. The governmental interest advanced most vigorously by respondent is the effectiveness of DNA testing in solving crimes. But, the effectiveness of a crime fighting technology does not render it constitutional. (See, e.g., *City of*

---

[34] In 2012, 393,439 adult felony arrests were made in California. (*Crime in California 2012*, *supra,* at p. 19 <http://oag.ca.gov/sites/all/files/agweb/pdfs/cjsc/ publications/candd/cd12/cd12.pdf?>.) Convictions resulted in 202,413 of these cases; the remainder resulted in dismissals or acquittals, denial of prosecutorial complaints, or law enforcement releases. (*Id.* at p. 49.) These convictions accounted for 68.5 percent of all final adult felony dispositions (*ibid.*), meaning that of all the adult felony arrests in 2012 that reached final disposition, slightly more than two thirds were convicted. The final disposition data does not account for all the adult felony arrests made in a year, as it does not include intermediate dispositions, diversion programs, suspended proceedings, reopenings, retrials, and subsequent actions. (*Id.* at p. 64.) Comparing the number of convictions (202,413) to the total number of arrests (393,439), only 51 percent of those arrested were convicted—that is, almost half the adult felony arrestees in 2012 were *not* convicted.

Respondent points out that the category of arrestees who were not convicted may include some who did in fact commit a crime. One example is an arrestee whose offenses result in revocation of probation rather than a new criminal prosecution; in 2012, 47,670 adults had probation revoked for a felony offense. (*Crime in California 2012*, *supra*, at p. 55.) Many of these arrestees, however, would have been subject to DNA testing when they were originally convicted. Arrestees whose cases are not pursued by the prosecutor for reasons such as inadmissible evidence or witnesses declining to testify, as respondent suggests, may in fact have committed crimes, but they are legally innocent.

*Indianapolis v. Edward, supra*, 531 U.S. at p. 42, *Ferguson v. City of Charleston* (2001) 532 U.S. 67, 83-84.) As Chief Justice Traynor put it, "a search, whether incident to an arrest or not, cannot be justified by what it turns up." (*People v. Brown* (1955) 45 Cal.2d 640, 643.) It has been stated, with respect to the federal Constitution, that because "[t]he interests in human dignity and privacy which the Fourth Amendment protects forbid any such intrusion on the mere chance that desired evidence might be obtained" (*Schmerber, supra*, 384 U.S. at pp. 769-770), "the mere fact that law enforcement may be made more efficient can never by itself justify disregard of the Fourth Amendment" (*Mincey v. Arizona* (1978) 437 U.S. 385, 393; *Arizona v. Gant*, *supra*, 556 U.S. at p. 349). This is all the more obvious under the California Constitution, which expressly recognizes a right to privacy, and even more so in the context of a search of such deeply personal and private information as is contained in a DNA sample.[35]

---

[35] In fact, if crime solving is the primary goal of the DNA Act, as appears to be the case, it is questionable whether its application will continue to be limited, or should be limited to felony arrestees and offenders. We take no position on the issue but think it appropriate to point out that some who have thought deeply about these questions believe DNA should be collected from everyone; and not just because it would make DNA databases as comprehensive as possible. (See, *DNA Databases, supra,* 2003 Wis. L.Rev. at pp. 451-452.) It is claimed universal DNA testing would:

(1) Eliminate the disproportionate representation of racial minorities in the database, making it fairer than sampling only offenders and arrestees (*DNA Databases, supra,* 2003 Wis. L.Rev. at pp. 439-440; Lynch et al., Truth Machine (2008) p. 153 [noting views regarding suggestions to expand United Kingdom's database]; Nydick, Comment: *The British Invasion (of Privacy): DNA Databases in the United Kingdom and United States in the Wake of the Marper Case* (2009) 23 Emory Int'l L.Rev. 609, 640).

(2) Obviate or mitigate concerns regarding "pretextual arrests to acquire DNA" and "kinship trawling." (Kaye, Response: *Maryland v. King: Per Se Unreasonableness, the Golden Rule, and the Future of DNA Databases* (2013) 127 Harv. L.Rev. F. 39, 47 (*Future of DNA Databases*).)

(3) Heighten public attention to the use of DNA databases and the vigilance of regulators (*DNA Databases, supra,* 2003 Wis. L.Rev. at p. 422, fn. 29, quoting Cole, Fingerprint Identification and the Criminal Justice System: Lessons for the DNA Debate, in Lazer, The Technology of Justice: The Use of DNA in the Criminal Justice System (2004).) Subjecting everyone—not just those perceived as criminals—to the risk of

For the reasons we have set forth, we conclude that the DNA Act, to the extent it requires felony arrestees to submit a DNA sample for law enforcement analysis and inclusion in the state and federal DNA databases, without independent suspicion, a warrant or even a judicial or grand jury determination of probable cause, unreasonably intrudes on such arrestees' expectation of privacy and is invalid under article I, section 13, of the Constitution.

The judgment is reversed.

_____
Kline, P.J.

We concur:

_____
Richman, J.

_____
Brick, J.*

* Judge of the Alameda County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

_____

accidental or intentional misuse of his or her DNA information and samples would undoubtedly improve administration of the program. As has been pointed out, "[i]t is too easy to approve of taking DNA from arrestees (or any group) when we presume that we will not be one of 'them.' But if 'we' truly conceive of ourselves as the recipients of this treatment, then we are more likely to arrive at a system with sufficient safeguards." (*Future of DNA Databases, supra,* 127 Harv. L.Rev. F. at p. 47.)

We raise these issues only to show that serious students of DNA sampling—virtually all of whom acknowledge that the chief purpose of the practice is criminal investigation, not identification—recognize the significant dangers it presents and the need to address them more forthrightly and efficaciously than does the DNA Act.

| | |
|---|---|
| Trial Court: | Superior Court of City and County of San Francisco |
| Trial Judge: | Hon. Carol Yaggy |
| Attorneys for Appellant: | First District Appellate Project<br>Jonathan Soglin, Executive Director<br>J. Bradley O'Connell, Asst. Director<br>Kathryn Seligman, Staff Attorney |
| Attorneys for Amicus Curiae in support of Appellant: | American Civil Liberties Union Foundation<br>Michael T. Risher<br><br>Paul Hastings LLP<br>Peter C. Meier<br>Eric A. Long<br>Jamie L. Williams<br><br>University of California Hastings College of the Law<br>Professor Joseph R. Grodin<br><br>Electronic Frontier Foundation<br>Hanni Fakhoury<br><br>California Public Defenders Association<br>California Attorneys for Criminal Justice &<br>Los Angeles County Public Defender<br>Linda F. Robertson<br>Jennifer Friedman<br><br>Federal Public Defender of the Eastern Dist. of CA<br>National Assoc. of Criminal Defense Lawyers<br>Daniel J. Broderick, Federal Defender<br>David Porter, Asst. Federal Defender<br>Rachelle D. Barbour |
| Attorneys for Respondent: | Edmund G. Brown Jr., Attorney General<br>Kamala D. Harris, Attorney General<br>Dane R. Gillette, Chief Asst. Atty. General<br>Gerald A. Engler, Sr. Asst. Atty. General<br>Joyce Blair, Supervising Deputy A.G.<br>Stan Helfman, Supervising Deputy A.G.<br>Jeffrey M. Laurence, Supervising Deputy A.G.<br>Enid A. Camps, Deputy Attorney General |

| | |
|---|---|
| Attorneys for Amicus Curiae DNA Saves, in support of Respondent: | Fulbright & Jarowski<br>Tillman James Breckenridge<br>Jonathan S. Franklin |
| Attorneys for Amicus Curiae in support of Respondent | Los Angeles County District Attorney<br>Steve Cooley, District Attorney<br>Irene Wakabayashi, Deputy District Attorney<br>Phyllis C. Asayama, Deputy District Attorney<br>Roberta Schwartz, Deputy District Attorney<br><br>California District Attorneys Association<br>W. Scott Thorpe |